## OWENS–CORNING FIBERGLAS CORPORATION

v.

## AMERICAN CENTENNIAL INSURANCE COMPANY et al.

Court of Common Pleas of Ohio,
Lucas County.

No. CI90–2521.

Decided Feb. 22, 1995.

184

*Connelly, Soutar & Jackson, William M. Connelly* and *Steven Smith; Covington & Burling, Mitchell F. Dolin, Jackson Sharman* and *Eric Lasker; Davis & Young Co., L.P.A.,* and *Martin J. Murphy,* for Owens–Corning Fiberglas Corporation.

*Shumaker, Loop & Kendrick, Peter Silverman* and *William Heywood; Chadbourne & Park, Peter Hillman* and *Debra Petalkis,* for American Centennial Insurance Company.

*Sullivan, Ward, Bone, Tyler, Fiott & Asher, Thomas Slavin* and *Thomas Auth; Mayer, Brown & Platt* and *Michael Gill; Joseph Walsh,* for Protective National Insurance Company.

*Weston, Hurd, Fallon, Paisley & Howley* and *Warren Rosman; Harrington, Foxy, Dubrow & Canter, Mark Flory* and *Melissa Harnett,* for Associated International Insurance Company.

RICHARD W. KNEPPER, Judge.

This matter is before the court on the parties' motions for partial summary judgment. The motions were filed pursuant to the pretrial order dated May 16, 1994. The remaining parties in the suit, all of which moved for summary judgment on various issues, are Owens–Corning Fiberglas Corporation ("OCF"), the plaintiff, and American Centennial Insurance Company ("ACIC"), Protective National Insurance Company ("PNIC"), and Associated International Insurance Company ("Associated"), the defendants.

*I*

OCF was a manufacturer and distributor of products containing asbestos material. As a result of this business activity, OCF sustained losses arising from product liability suits filed against it. On July 27, 1990, OCF filed the instant action seeking declaratory relief. To date, all defendants have settled, been dismissed, or been defaulted, except for ACIC, PNIC, and Associated.

Pursuant to the pretrial held April 13, 1994, the parties agreed that motions for partial summary judgment would be filed on August 2, 1994, with responses being filed on August 30, 1994. The parties moved on a total of eleven separate issues. Those issues regard the following: (1) the Policy Binder submitted by OCF; (2) the "known loss doctrine"; (3) fraud and misrepresentation; (4) timeliness of notice to the defendants regarding the number of asbestos claims pending against OCF; (5) trigger of coverage; (6) scope of coverage; (7) the amount of underlying insurance which needs to be exhausted before ACIC's and PNIC's coverage takes effect; (8) defense expenses regarding Associated's policy; (9) the time-frame within which the underlying insurance must be exhausted before Associated's coverage takes effect; (10) coverage of expected or intended losses; and (11) coverage of punitive damages awards.

Oral arguments were held on September 8, 1994. The court heard arguments on five of the eleven issues. Each of the eleven issues will be decided separately.

*II*

The general rules governing motions for summary judgment filed pursuant to Civ.R. 56 are well established. In *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 74, 375 N.E.2d 46, 47, the Supreme Court of Ohio stated the requirements that must be met before a motion for summary judgment can be granted:

"The appositeness of rendering a summary judgment hinges upon the tripartite demonstration: (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor."

A motion for summary judgment may force the nonmoving party to produce evidence on an issue for which she bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus. The moving party has the burden of demonstrating, through the pleadings, depositions, answers to interrogatories, and

admissions on file, together with affidavits, if any, that with respect to every essential issue, there is no genuine issue of fact. *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 114–115, 526 N.E.2d 798, 800–801.

## III

At oral arguments, OCF objected to ACIC and PNIC having filed a cross-motion regarding the trigger of coverage issue. The cross-motion was filed contemporaneously with ACIC and PNIC's response to OCF's motion on the same issue. The court ruled in open court, and it is hereby memorialized, that ACIC and PNIC's cross-motion is untimely, as it was filed on August 30, 1994. The court refused to grant ACIC and PNIC leave to file their cross-motion because all parties agreed to the sequence for filing motions, as set forth in the pretrial order. ACIC and PNIC's brief on trigger of coverage will, therefore, be treated only as a response, and not as a motion.

### A. POLICY BINDER

As a preliminary matter, the structure of OCF's insurance coverage should be discussed. The three remaining defendants are excess carriers. As such, they are not liable to provide coverage until the underlying insurance has been exhausted.

The timespan of coverage concerning the remaining defendants is March 9, 1979 to September 1, 1984. During that period, the defendants insured for different amounts and during various policy periods. To illustrate, Associated's policy period is from March 9, 1979 to September 1, 1979. It is not liable to provide coverage until $100,000,000 of underlying insurance is exhausted. (Policy Binder, Exhibit A at 6.) ACIC's policy periods are from September 1, 1979 to September 1, 1982 and from September 1, 1983 to September 1, 1984. ACIC is not liable to provide coverage until $150,000,000 of underlying insurance has been exhausted. (Policy Binder, Exhibits B at 134 and 136; C at 212 and 213; D at 273 and 274; F at 446.) PNIC's policy periods are from September 1, 1982 to September 1, 1983, with liabilities attaching after $25,000,000 as to one policy and after $150,000,000 as to the other (Policy Binder, Exhibit E at 337 and 361), and from September 1, 1983 to September 1, 1984, with liability attaching after $100,000,000. (Policy Binder, Exhibit F at 437.)

During the relevant timespan, OCF had primary coverage, insured or self-insured, ranging from $25,000,000 to $85,000,000. In addition, OCF had umbrella policies with Northbrook Excess and Surplus Insurance Company ("North-

brook"), from September 1, 1979 to September 1, 1982, and with Transit Casualty Company ("Transit"), from September 1, 1982 and September 1, 1984.

Because the coverage provided by these defendants' policies is at issue, OCF moved for the Policy Binder[1] to be admitted into evidence *in toto*. ACIC objected to the inclusion of pages 499, 501, 502, and 503, which relate to policies of ACIC.

In accordance with this court's holding in open court, OCF's motion is found well taken, with the exception that pages 499, 501, 502, and 503 be stricken from the court's consideration. The Policy Binder will, therefore, be admitted into evidence for the court's consideration. This ruling does not prohibit amendments to the Policy Binder that may be admitted by stipulation of the parties or by further leave of court.

## B. *KNOWN LOSS DOCTRINE*

■■■ This matter is before the court on OCF's and Associated's motions regarding the "known loss doctrine." Upon consideration of the pleadings, memoranda of counsel, evidence and applicable law, the court grants OCF's motion and denies Associated's motion.

Associated, in its motion, and ACIC and PNIC, in their brief in opposition, urge the court to adopt the "known loss doctrine" as a defense to coverage. In support of its motion, Associated cites various cases which implemented the doctrines of "known loss," "known risk," and "progressive loss." In its argument, Associated uses these terms synonymously and refers to them collectively as the "known loss doctrine." OCF, on the other hand, argues that the doctrine should not be adopted. OCF reasons that it is not recognized in Ohio's insurance law and it does not afford any greater defense than is already available within the policy. Specifically, the policy provides that losses which are either "expected" or "intended" will not be covered.

In order to determine whether to adopt the doctrine, this court must first determine what the "known loss doctrine" provides. Generally, the "known loss doctrine" is a compilation of law gathered from various jurisdictions. The basic premise of the doctrine is that insurance coverage is only permitted for fortuitous[2] or accidental events. Hence, "[t]he concept of insurance is that * * * the

---

1. OCF submitted the Policy Binder as an exhibit to its motion.

2. A "fortuitous event" is one that is dependent on chance and unknown to the parties. See *Texas E. Transm. Corp. v. Marine Office–Appleton & Cox Corp.* (C.A.10, 1978), 579 F.2d 561.

carrier insures against a risk, not a certainty." [3] *Bartholomew v. Appalachian Ins. Co.* (C.A.1, 1981), 655 F.2d 27, 29.

A review of some of the jurisdictions that apply the "known loss doctrine" illustrates the broad spectrum of standards applied, when determining whether coverage is prohibited because of a foreseen or known loss. Initially, one analysis sets forth that the "known loss doctrine" can be invoked and coverage prohibited "[i]f the insured knows or has reason to know, when it purchases [insurance], that there is a *substantial probability* that it will suffer or has already suffered a loss * * *." (Emphasis added.) *Outboard Marine Corp. v. Liberty Mut. Ins. Co.* (1992), 154 Ill.2d 90, 103, 180 Ill.Dec. 691, 697, 607 N.E.2d 1204, 1210.[4] See, also, *City of Carter Lake v. Aetna Cas. & Sur. Co.* (C.A.8, 1979), 604 F.2d 1052. An alternative analysis of the "known loss doctrine" states that "insurers whose policy terms commence after initial manifestation of the loss are not responsible for any potential claim relating to the previously *discovered* and *manifested* loss." (Emphasis added.) *Prudential–LMI Commercial Ins. v. Superior Court of San Diego Cty.* (1990), 51 Cal.3d 674, 699, 274 Cal.Rptr. 387, 403–404, 798 P.2d 1230, 1246–1247.

By contrast, when it is unknown whether an inevitable loss will occur during the insurer's policy period, the loss is fortuitous. *Essex House v. St. Paul Fire & Marine Ins. Co.* (S.D.Ohio 1975), 404 F.Supp. 978. In this instance, the court found that the loss was fortuitous even though there existed blatant defects which made the failure of the brick structure inevitable. *Id.* The court rationalized that, although the collapse of the wall was inevitable, it was uncertain when the loss would occur. *Id.*

Additionally, even if it is shown that the "harm preexisted the policies * * *, there is no 'known loss' * * * if [the insured's] *legal liability* for such damage was yet to be determined at the time the policies were issued." (Emphasis added.) *Monsanto Co. v. Aetna Cas. & Sur. Co.* (Dec. 9, 1993), Del.Super. No. 88C–JA–118, unreported, 1993 WL 563251, at *16. .The court in *Monsanto* found there to be an insurable risk under third-party policies because there was "uncertainty about the imposition of liability and no 'legal obligation to pay' " at

---

3. In *Bartholomew,* car wash equipment continually malfunctioned, causing damage. The court found that the insured was not entitled to coverage for loss occurring after the insured realized the problem yet deliberately continued to use the equipment.

4. Prior to purchasing insurance, the insured in *Outboard* was aware that it was responsible for pollutants entering a river. Hence, the court determined that the insured should have "known" that loss would ensue.

the time the policies were issued.[5] *Id.*

As *Monsanto* indicates, in addition to the spectrum of standards implemented for the "known loss doctrine," the doctrine is applied differently depending on whether it involves first- or third-party insurance. This additional factor further complicates the manner in which the "known loss doctrine" should be applied. Typically, first-party insurance covers losses sustained to the insured's own property. *Montrose Chem. Corp. of California v. Admiral Ins. Co.* (1992), 35 Cal.App.4th 335, 356–357, 5 Cal.Rptr.2d 358, 371. On the other hand, third-party policies "afford coverage for sums which the insured shall become legally obligated to pay as damage because of bodily injury or property damage" sustained by a third person. *Id.* In either situation, "insurance cannot be obtained for damage which has already occurred because the absence of risk precludes coverage." *Id.*

This court is unwilling to recognize the "known loss doctrine" as a viable defense for two reasons. First, no Ohio court recognizes the doctrine. Associated's reliance on *Essex House*, for support from Ohio, is misplaced, as that court merely recognized that first-party insurance covers only fortuitous loss. *Essex House, supra.* The Ohio cases which recognized that losses must be fortuitous, however, make no mention of the "known loss doctrine" or other related doctrines which have evolved from the fortuity doctrine. See, *e.g., Essex House, supra.* See, also, *Univ. of Cincinnati v. Arkwright Mut. Ins. Co.* (Aug. 17, 1993), S.D.Ohio No. C–1–91–714, unreported, 1993 WL 512614. In the absence of any support in Ohio law, this court declines to introduce the "known loss doctrine" to Ohio's insurance law.

Second, the defense that only fortuitous losses are insurable is already provided for in the policy, which states that only an "occurrence" which is neither "expected or intended" will be covered. Although the defendants assert that the "known loss doctrine" provides an alternative defense from that of the "expected or intended" arguments, they fail to support this proposition. In this court's view, to embrace the "known loss" theory offered by the defendants might well swallow up the more narrow doctrines regarding (1) fraud and misrepresentation and (2) damages that are "expected or intended" by the insured.[6] Finally, because this court finds that this defense is already available to the defendants, it

---

5. Monsanto's manufacturing processes produced toxic waste that was buried in earthen pits. Eventually, these pits leaked and caused ground contamination.

6. Although not binding on this court, the rationale in *City of Johnstown, N.Y. v. Bankers Std. Ins. Co.* (C.A.2, 1989), 877 F.2d 1146, is persuasive on this point. That court also determined that it should not recognize the "known loss doctrine" because it had never been previously applied in New York and there were other defenses available which were already incorporated in the policy and recognized in that jurisdiction.

is unnecessary to delve into the varying applications of "known loss" in order to manufacture one coherent doctrine.

As the court is disinclined to permit the defendants from asserting the "known loss doctrine" as a novel defense in Ohio insurance law, Associated's motion is denied and OCF's motion is granted.

## C. *FRAUD OR MISREPRESENTATION*

This matter is before the court on OCF's motion regarding defendants' counterclaim on the issues of fraud and/or misrepresentation. OCF moves that no defendant is able to establish a claim of fraud or misrepresentation; therefore, OCF is entitled to summary judgment. Additionally, OCF argues that Associated has exceeded the applicable statute of limitations regarding fraud and is, therefore, time-barred from asserting its counterclaim on that issue. Furthermore, OCF asserts that the doctrine of laches precludes Associated from asserting the affirmative defense of fraud or misrepresentation. Upon due consideration of the pleadings, memoranda of counsel, evidence and applicable law, this court denies OCF's motion as to ACIC and PNIC and grants OCF's motion as to Associated.

1. *ACIC's and PNIC's Counterclaims Alleging Fraud And/Or Misrepresentation*

OCF contends that the defendants are unable to establish the elements of fraud against it. To maintain a fraud claim, the defendants must demonstrate:

(a) actual concealment by a party with a duty to disclose

(b) of a material fact

(c) with knowledge of the fact concealed

(d) with justifiable reliance upon the concealment

(e) with resulting injury proximately caused by the reliance. See *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus. See, also, *Miles v. McSwegin* (1979), 58 Ohio St.2d 97, 100, 12 O.O.3d 108, 110, 388 N.E.2d 1367, 1369, and *Carrols Corp. v. Canton Joint Venture* (June 27, 1990), Stark C.P. No. 88–2115–1, unreported, 1990 WL 99047.

■■■ There exists a heightened duty regarding insurance policies which requires the insured to act with the utmost good faith. *Buemi v. Mut. of Omaha Ins. Co.* (1987), 37 Ohio App.3d 113, 116, 524 N.E.2d 183, 186–187. Failure by the insured to disclose known conditions affecting the risk makes the contract voidable at the insurer's option. *Washington Mut. Ins. Co. v. Merchants &*

*Mfrs.' Mut. Ins. Co.* (1856), 5 Ohio St. 450, 479. See, also, *Sherwin–Williams Co. v. Certain Underwriters at Lloyd's of London* (N.D.Ohio 1993), 813 F.Supp. 576. It is well established that where there is a duty to disclose, as there is in insurance contracts, fraud can be found not only as a result of affirmative misrepresentations, but also by concealing material information. *Miles, supra,* 58 Ohio St.2d at 99, 12 O.O.3d at 109–110, 388 N.E.2d at 1368–1369. Nondisclosure will support a claim for fraud under Ohio law when it becomes the duty of a person to speak in order that the party with whom he is dealing may be placed on an equal footing with him. *Mancini v. Gorick* (1987), 41 Ohio App.3d 373, 374, 536 N.E.2d 8, 9.

■ In Ohio, the elements of fraud are susceptible of proof by circumstantial evidence. *AMF, Inc. v. Computer Automation, Inc.* (S.D.Ohio 1983), 573 F.Supp. 924, 933 (applying Ohio law). Proof of fraud by circumstantial evidence can often only be produced at trial. Therefore, "fraud typically presents triable issues of fact." *Id.* As observed by the Cuyahoga County Circuit Court in *Atwater v. Jones* (1902), 24 Ohio C.C.(N.S.) 328, 332, affirmed (1904), 70 Ohio St. 421, 72 N.E. 1160:

"It has been said that fraud is never presumed, but must always be proved. It is not meant by that, that the fraud must be proved by direct evidence, for a party who commits fraud always covers up his proceedings in a way that is difficult, if not impossible in nearly all cases to prove the very act or the very intent of the party who has committed the fraud. Therefore, it is always proper to prove fraud by circumstances, and actual fraud is inferred in nearly all cases by the circumstances proved * * *."

In order for OCF to be granted summary judgment, pursuant to Civ.R. 56(C), OCF must satisfy the following criteria:

"(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274.

■ This court finds that ACIC and PNIC offered evidence sufficient to support each of the elements of fraud. When viewing the evidence in a light most favorable to the defendants, reasonable minds can differ regarding whether OCF's conduct amounted to fraud.

■ It should initially be noted that OCF had a duty to act with the utmost good faith when disclosing information to its potential insurers. See *Buemi,*

*supra.* It is undisputed that Marsh & McLennan, at the behest of OCF, prepared its own questionnaire and answers to distribute to the solicited insurers. Because this questionnaire and OCF's annual report were the only sources of information given to the insurers to assist in their determination of whether or not to provide coverage, OCF had to disclose all material information within these documents.[7]

ACIC and PNIC offer as evidence several pieces of information that OCF knowingly had in its possession, but failed to fully disclose to these defendants. This court finds that reasonable minds can differ regarding whether these items were material to the transaction of procuring insurance, whether these items were known to OCF and concealed from these defendants, and whether these defendants justifiably relied on the insufficient information provided, causing injury to the defendants. Because this court finds that reasonable minds can differ, OCF will not be granted summary judgment on this issue.

OCF had a report prepared by the Washington Analysis Corporation dated January 18, 1979, evaluating asbestos products liability exposure for certain companies, including OCF. The report concluded that there existed "a realistic potential for thousands upon thousands of lawsuits over the next several years." The total over that period "could exceed 100,000." Washington Analysis Corporation Report at 1 and 7 (Defendants' Exhibit Appendix at 207–225). Furthermore, the report set forth that the Department of Health, Education and Welfare ("HEW") estimated that between eight and eleven million workers were exposed to asbestos in the United States since World War II and approximately four million of those workers were heavily exposed. *Id.* at 6. Of the four million workers heavily exposed, HEW estimated that twenty to twenty-five percent would die of lung cancer, seven to ten percent of mesothelioma, and eight to nine percent of gastrointestinal cancer. HEW estimated that 1.6 million heavily exposed workers are expected to die of asbestos-related diseases. *Id.* at 6–7. The report further indicated that a "conservative" estimate of a company's potential liability, for projected mesothelioma victims alone, "would range between $750 million and $1 billion over the next 15 to 20 years." *Id.* at 8.

Several employees of OCF knew of the Washington Analysis report, including George Gominger, OCF's Director of Insurance. Gominger Dep. 125–126. Nev-

---

7. OCF contends that it should not be held responsible for any alleged failure by Marsh & McLennan to disclose all pertinent information to the insurers. This argument, however, is without merit. A principal is bound by the fraudulent representations and nondisclosures of its agent. See, *e.g., DeSantis v. Smedley* (1986), 34 Ohio App.3d 218, 220–221, 517 N.E.2d 1038, 1041–1042 (principal liable for agent's fraud even though principal did not benefit); *Stuart v. Natl. Indemn. Co.* (1982), 7 Ohio App.3d 63, 67, 7 OBR 76, 79–80, 454 N.E.2d 158, 163–164 (both agent and principal liable for agent's fraud).

ertheless, this report was never presented to the defendants when solicited for coverage.

OCF, additionally, did not inform the defendants that OCF released Aetna, its primary and umbrella carrier, from asbestos coverage in the last five months of the 1978–1979 policy period. Nor did OCF indicate that Aetna was relieved of providing asbestos coverage because Aetna's underinsurers were threatening to immediately cancel coverage. The underinsurers based their decision on the belief that the dramatic increase in the number of claims after January 1979 would exceed the $10,000,000 threshold and pierce the umbrella layer in the policy year ending September 1, 1979. See Langner Dep.Ex. 26. In viewing the evidence in a light most favorable to the defendants, it is questionable whether OCF's disclosure of the number of pending claims sufficiently demonstrated this "dramatic increase" in claims.

It is also questionable whether OCF's mention of "self-insurance" was adequate to indicate to the defendants that Aetna was no longer covering asbestos claims, but rather, was merely processing claims for OCF. OCF contends that the following language sufficiently disclosed OCF's self-insurance status for asbestos exposure claims:

"1,000,000 CSL [combined single limit]/$35,000,000 AGG [aggregate] Including Allocated Expenses/Self–Insured Claims Handled by Aetna Casualty Co." [8]

Each piece of evidence offered by the defendants is sufficient to allow reasonable persons to conclude differently on the issue of whether OCF sufficiently disclosed information. Clearly, OCF knew of this information. Additionally, reasonable persons could conclude that this information was material to these defendants' decision to provide coverage. Had these defendants been supplied this information, then they may not have undertaken to provide coverage.

This brings the court to the question of whether ACIC and PNIC relied, to their detriment, on the information provided. As mentioned previously, the elements of fraud are largely proven through circumstantial evidence. *AMF*, *supra*. The defendants have presented enough facts and circumstances to sufficiently raise an inference or presumption of justifiable reliance.

The personnel who actually assessed the risk and set the premiums on OCF's policies are deceased or are unable to be located. However, John Kraeutler, president of the managing general agent that decided to underwrite OCF's policy with ACIC, testified that TUI expected OCF's disclosure to be complete and accurate and that TUI relied on the information OCF provided. Kraeutler Dep.

---

8. The only changes from this language, found in the 1980 application, are alterations in the aggregate limits and parenthetical additions.

120–121 and 129. Kraeutler's testimony is sufficient, when viewed in a light most favorable to these defendants, to raise a question of whether these defendants also relied on the information provided by OCF. Based on Kraeutler's testimony, this court finds that these defendants should, at a minimum, be provided the opportunity to prove reliance at trial through the development of circumstantial evidence.

Furthermore, an Ohio court has held that where it is shown that material misrepresentations have been made to a party, "proof of reliance may be sufficiently established by inference or presumption from circumstantial evidence to warrant submission to a jury without direct testimony * * *." *Amato v. Gen. Motors Corp.* (1982), 11 Ohio App.3d 124, 128, 11 OBR 203, 207–208, 463 N.E.2d 625, 629. Therefore, this court also holds that where there is at least a question of whether OCF withheld or misrepresented material information, there exists an inference that defendants relied on the information provided. OCF provided information to ACIC and PNIC. Based on the information given, ACIC and PNIC sold OCF insurance. Therefore, this evidence raises at least an inference that ACIC and PNIC justifiably relied on the information provided.[9]

Finally, there is a question regarding whether ACIC and PNIC suffered injury as a result of OCF's alleged fraud. The injury suffered by these defendants, presuming a finding of concealment or fraud, is a lack of opportunity to make an informed decision regarding the risk they would insure and the premiums they would charge.

Based on the evidence submitted by ACIC and PNIC, this court finds that genuine issues exist which warrant a trial by jury on the issue of fraud, concealment, or misrepresentation as pleaded by ACIC and PNIC. OCF's motion as to ACIC and PNIC is, therefore, denied.

2. *Associated's Counterclaim and Defense of Fraud and/or Misrepresentation*

OCF argues that Associated's fraud and/or misrepresentation counterclaim is barred by the applicable statute of limitations. In addition, OCF moves that, pursuant to the doctrine of laches, Associated's counterclaim and fraud and/or misrepresentation defense are barred from being asserted. This court finds OCF's arguments well taken.

---

9. OCF argues that the information given should have raised "red flags." OCF contends that these defendants should have asked for more information if they felt what was given was insufficient. OCF's rationale is misplaced, as OCF has a good faith duty to disclose all it knew when soliciting insurance coverage.

In Ohio, an action for relief on the ground of fraud is barred if not filed within four years after the cause thereof accrued. R.C. 2305.09(C). Associated's counterclaim for reformation or rescission is an equitable claim and is based on alleged misrepresentation. Thus, "where fraud is the gist of the relief sought, the action will be governed by the 4–year statute." (Footnotes omitted.) 66 Ohio Jurisprudence 3d (1985) 202–203, Limitations and Laches, Section 61.

The Ohio statute provides that a claim accrues when the fraud is discovered. R.C. 2305.09(C). Ohio case law elaborates further that a cause of action for fraud does not accrue until the defrauded party is damaged. *Kunz v. Buckeye Union Ins. Co.* (1982), 1 Ohio St.3d 79, 1 OBR 117, 437 N.E.2d 1194. See, also, *Carter v. Am. Aggregates Corp.* (1992), 82 Ohio App.3d 181, 611 N.E.2d 512.

In March 1979, through a chain of brokers, OCF solicited coverage from Associated. On March 1, 1979, Lee Duncan of Cosmos, Associated's authorized underwriter, sent a telex agreeing to write the coverage. OCF Exhibit Binder at 670. Tom Vinson, Duncan's colleague at Cosmos, wrote a note on the telex which read: "Bound 3–8–79 to 9–1–79[;] F.F. [follow form] on asbestosis exclusion as it is now written, total exclusion after 9–1–79. Change price to 3,000/m[illion]." *Id.*

It is undisputed that the "exclusion" referred to is the Fry/Trumbull exclusion which is found in the underlying Aetna policy.[10] It is apparent from Vinson's note that at least one of Associated's underwriters understood that the exclusion was only partial and that the premium should be increased to reflect that fact. Nevertheless, Associated offers two affidavits which state that, through the chain of brokers, Associated was informed that the Fry/Trumbull exclusion acted as an absolute exclusion.[11]

On March 9, 1979, Duncan requested a "letter to confirm that no other company [besides Fry or Trumbull] is involved in the sale, distribution or manufacturing [of asbestos]." OCF Exhibit Binder at 671. On June 18, 1979, after conferring with OCF, C. Edward Craddock of Picton Cavanaugh, OCF's broker in Toledo, replied to Duncan's information request. Craddock's letter indicated that OCF's potential exposure was much broader than merely the Fry and Trumbull companies, which were now owned by OCF. In July 1979 when Duncan received a reply, he realized that it was "not the letter that [he] expected to get" based on his March 1979 impressions. Duncan Dep. 43–44, 48, 53, 190.

---

10.. Fry and Trumbull were companies bought by OCF that had potential asbestos liability exposure. Aetna excluded from its coverage asbestos claims regarding these companies. Fry and Trumbull were not, however, the only segments of OCF's business that exposed OCF to potential asbestos liability.

11. As this court ultimately finds that Associated exceeded the applicable statute of limitations on its fraud claim, it is unnecessary to resolve the issue of whether this particular communication came from an agent of OCF.

Although Mr. Duncan testified that he knew of the alleged fraud in July 1979, he admitted that he did nothing about it. He never complained to the brokers he was dealing with, nor anyone else. Duncan Dep. 48, 194; Sheppard Dep. 96–98, 122. Nor did Duncan try to get the policy amended to add an absolute asbestos exclusion, even though he conceded that he had the power in July 1979 to unilaterally insert an absolute asbestos exclusion into the Associated policy retroactive to the date of the policy's inception. Duncan Dep. 83–84, 191.

Associated argues that the statute did not begin to run until it suffered some injury as a result of the misrepresentation. Associated asserts that this injury did not occur until November 1991 when it was notified that its policy levels would be reached. This court, however, disagrees with Associated's argument.

Associated is suing for rescission of the policy based on these alleged misrepresentations. However, it could have sued for rescission based on fraud in 1979. Additionally, as Associated now pleads, it could have unilaterally inserted an absolute asbestos exclusion in 1979. In essence, it could have reformed the contract itself in 1979. At the very least it could have complained—it did nothing. What Associated did do was keep the premiums which were paid and keep quiet.

This court finds that the statute of limitations for Associated's fraud claim began to run in July 1979 when it was made aware, upon receipt of Craddock's letter, of the alleged misrepresentation. Associated's allegations of fraud are, therefore, time barred, as Associated did not file its counterclaim until 1992, some thirteen years after it discovered the alleged fraud.

This court further finds that, in any event, the equitable doctrine of laches bars both the counterclaim and the affirmative defense of misrepresentation. Under Ohio law, laches is "an omission to assert a right for an unreasonable and unexplained length of time, under circumstances prejudicial to the adverse party." *Connin v. Bailey* (1984), 15 Ohio St.3d 34, 35, 15 OBR 134, 134–135, 472 N.E.2d 328, 329; *Papenhagen v. Papenhagen* (Nov. 21, 1986), Lucas App. No. L–85–446, unreported, 1986 WL 13181. In order to establish a laches defense, a party must show "(1) [unreasonable] delay or lapse of time in asserting a right, (2) absence of an excuse for such delay, (3) knowledge, actual or constructive, of the injury or wrong, and (4) prejudice to the other party." *State ex rel. N. Olmsted Fire Fighters Assn. v. N. Olmsted* (1992), 64 Ohio St.3d 530, 536–537, 597 N.E.2d 136, 142; *Kennedy v. Cleveland* (1984), 16 Ohio App.3d 399, 403, 16 OBR 469, 472–473, 476 N.E.2d 683, 688.

Associated does not deny that it had knowledge of the alleged fraud in July 1979. A thirteen-year delay is an unreasonable period of time to bring an action

in fraud. Because Associated contends that it had no right to bring the action until, at the earliest, November 1991, it offers no excuse or rationale for the lengthy delay.

The facts supporting prejudice to OCF, however, are numerous. First, not having received any complaints from Associated for more than ten years, OCF relied that Associated's policy was a valuable corporate asset to be called upon when needed. Second, had Associated raised a question about the policy in 1979, OCF could have done a number of things: (a) it could have immediately litigated the matter, while witnesses were alive, memories were fresh, and document files were intact [12]; (b) alternatively, if Associated had threatened to rescind the policy or add an absolute asbestos exclusion, OCF could have immediately sought out another carrier to replace Associated on the risk, during a time when excess coverage without asbestos exclusions was easier to obtain; or (c) as an accommodation, OCF might have agreed to a premium increase in order to keep Associated on the risk and avoid a fight.

The doctrine of laches, like the statute of limitations, is designed to protect contracting parties from the prejudice inherent in a delay as long as this one. OCF has been prejudiced by Associated's long silence. This court will not allow Associated to sit back, quietly collecting premiums, while the entire time it is planning on asserting, thirteen years after discovering the alleged misconduct, a fraud and/or misrepresentation claim and defense. This court, therefore, finds OCF's motion well taken. Associated is barred from asserting its counterclaim seeking reformation and rescission based on both the applicable statute of limitations and the doctrine of laches. Furthermore, pursuant to the doctrine of laches, Associated is barred, because of its extreme delay, in asserting its fraud defense.

## D. *TIMELINESS OF NOTICE*

This matter is before the court on OCF's motion seeking a declaration that the notice to the defendants of their potential liability was timely. Associated did not

---

12. Duncan and Sheppard were unable to recall either the alleged fraud or the fact that Associated had issued a policy to OCF until counsel assisted in recollecting their memories. Duncan Dep. 44; Sheppard Dep. 113–117.

Additionally, a couple of participants who may have had relevant information regarding the alleged fraudulent transaction are either deceased or cannot be located. (For example, Gene Early and Robert O'Brien.)

Finally, all of the files from 1979 held by Swett & Crawford, one of the brokers in the chain of transactions between OCF and Associated, were destroyed in accordance with its seven-year document retention practices. Sheppard Dep. 123.

respond [13]; however, ACIC and PNIC argue that notice was untimely given and, as a result, coverage is precluded. Upon consideration of the pleadings, memoranda of counsel, evidence, depositions and applicable law, the court grants OCF's motion.

■ The Ohio Supreme Court has held that notice provisions in insurance contracts are conditions precedent to insurance coverage. *Kornhauser v. Natl. Sur. Co.* (1926), 114 Ohio St. 24, 150 N.E. 921, paragraph three of the syllabus; *Heller v. Std. Acc. Ins. Co.* (1928), 118 Ohio St. 237, 160 N.E. 707, paragraphs two and three of the syllabus; *Krasny v. Metro. Life Ins. Co.* (1944), 143 Ohio St. 284, 28 O.O. 199, 54 N.E.2d 952, paragraph three of the syllabus. See, also, *Woyma v. Begovic* (July 14, 1994), Cuyahoga App. No. 64985, unreported, 1994 WL 372548; *Liberty Sav. Bank v. Lawyers Title Ins. Corp.* (Dec. 31, 1990), Butler App. No. CA89–12–174, unreported, 1990 WL 235470; *Miller v. Indian Lake Ins.* (Nov. 13, 1990), Logan App. No. 8–89–18, unreported, 1990 WL 178947; *Am. Employers Ins. Co. v. Metro Regional Transit Auth.* (C.A.6, 1994), 12 F.3d 591, 597 (applying Ohio law). Such a requirement is of the essence of the contract. *Krasny, supra*, 143 Ohio St. at 291, 28 O.O. at 202, 54 N.E.2d at 955–956. Thus, when notice is required by the contract, an insured's failure to provide timely notice precludes coverage. *Krasny, supra*, at paragraph three of the syllabus; *Am. Employers, supra*, 12 F.3d at 597.

Some jurisdictions require an insurer to prove that it was prejudiced by untimely notice before the insurer is relieved of its obligation to provide coverage. See *Wendel v. Swanberg* (1971), 384 Mich. 468, 478–480, 185 N.W.2d 348, 353 (applying Michigan law); *Brakeman v. Potomac Ins. Co.* (1977), 472 Pa. 66, 76–77, 371 A.2d 193, 198 (applying Pennsylvania law). Several courts of appeals in Ohio, other than the Sixth Appellate District, have adopted a modified prejudice rule that establishes a rebuttable presumption of prejudice upon the finding of untimely notice. See *W. Am. Ins. Co. v. Hardin* (1989), 59 Ohio App.3d 71, 73, 571 N.E.2d 449, 452; *Patrick v. Auto–Owners Ins. Co.* (1982), 5 Ohio App.3d 118, 119, 5 OBR 235, 235–236, 449 N.E.2d 790, 791. Under this latter rule, once the insured has offered some evidence that the insurer has not been prejudiced, the burden shifts to the insurer to prove prejudice. See *Hardin, supra*, 59 Ohio App.3d at 73, 571 N.E.2d at 452.

In *Ruby v. Midwestern Indemn. Co.* (1988), 40 Ohio St.3d 159, 161, 532 N.E.2d 730, 732, the Ohio Supreme Court acknowledged the rebuttable-presumption-of-

---

13. There is no dispute regarding timeliness of notice to Associated, as it received a letter regarding OCF's asbestos claims in August 1980.

prejudice rule. By not embracing this rule in its syllabus, however, the *Ruby* court did not make this rule the law of Ohio.[14] S.Ct.R.Rep.Op. 1(B) provides that:

"The syllabus of a Supreme Court opinion states the controlling point or points of law decided in and necessarily arising from the facts of the specific case before the Court for adjudication."

The Ohio Supreme Court has long indicated that the syllabus, alone, states the law of the case. *State v. Wilson* (1979), 58 Ohio St.2d 52, 60, 12 O.O.3d 51, 56, 388 N.E.2d 745, 750–751. Any other words in an Ohio Supreme Court opinion are dicta, *id.*, and not a part of the court's decision, *Haas v. State* (1921), 103 Ohio St. 1, 7–8, 132 N.E. 158, 159–160, at syllabus. Additionally, the text of the *Ruby* opinion primarily focused on an insured's interference with the insurer's subrogation rights rather than notice or prejudice. Thus, this court concludes that the Ohio Supreme Court and the law of Ohio controlling this court do not require a showing of prejudice by the insurer before coverage is avoided. See *Am. Employers, supra,* 12 F.3d at 596.[15]

■ Insurance policies requiring notice "as soon as practicable," as the policies here require, have been interpreted as requiring notice within a reasonable period of time. See *Motorists Mut. Ins. Co. v. Speck* (1977), 59 Ohio App.2d 224, 229–230, 13 O.O.3d 239, 241–242, 393 N.E.2d 500, 503. Although prejudice is not required to preclude coverage when notice is untimely, prejudice to the insurers may be considered in determining whether notice was given within a reasonable time. *Am. Employers, supra,* 12 F.3d at 597.

The purpose behind the timely notice requirement is to provide the insurer the opportunity to investigate a claim and thereby protect its rights, plan for its liabilities, and prevent fraud. *W. Am. Ins. Co. v. Hardin,* 59 Ohio App.3d at 73, 571 N.E.2d at 452. The determination of whether an insured has complied with the requirement of providing notice within a reasonable time, therefore, should be heavily influenced by the *effect* any delay may have had upon the carrier's ability properly to *defend* a lawsuit. *Am. Employers, supra,* 12 F.3d at 595. See, also, *Keith v. Lutzweit* (1957), 106 Ohio App. 123, 126, 6 O.O.2d 396, 398, 153 N.E.2d 695, 698 ("It would seem that the effect of delay upon the company's opportunity properly to defend the lawsuit should weigh heavily in the scale.").

---

14. Instead, the court's syllabus merely indicates that a requirement of "prompt" notice, set forth in an insurance contract, "requires notice [to an insurer] within a reasonable time."

15. The court notes that Ohio is joined by other jurisdictions in not requiring a showing of prejudice to avoid coverage. See, *e.g., Unigard Sec. Ins. Co. v. N. River Ins. Co.* (1992), 79 N.Y.2d 576, 580–582, 584 N.Y.S.2d 290, 292, 594 N.E.2d 571, 573; *Commercial Union Ins. Co. v. Internatl. Flavors & Fragrances, Inc.* (C.A.2, 1987), 822 F.2d 267, 271.

As a general rule, a determination as to whether a delay in notice was unreasonable is based on the facts and circumstances of the case. *Am. Employers, supra,* 12 F.3d at 597. What constitutes a reasonable amount of time is generally a question for the trier of fact. *Patrick, supra,* 5 Ohio App.3d at 119, 5 OBR at 235–236, 449 N.E.2d at 791; *Am. Employers, supra,* 12 F.3d at 598, citing *Employers' Liab. Assur. Corp. v. Roehm* (1919), 99 Ohio St. 343, 124 N.E. 223, syllabus. However, in some undisputed factual circumstances, the court may make a determination as a matter of law. See *Patrick, supra,* 5 Ohio App.3d at 119, 5 OBR at 235–236, 449 N.E.2d at 791. See, also, *Am. Employers, supra,* 12 F.3d at 598, citing *Employers' Liab., supra,* syllabus; *Fireman's Fund Ins. v. Valley Manufactured Prods. Co.* (D.C.Mass.1991), 765 F.Supp. 1121, 1123. The burden to prove compliance with the notice provisions in an insurance contract falls upon the insured. *Woyma v. Begovic, supra.*

This court finds, as a matter of law, that OCF provided ACIC and PNIC with timely notice as required by the policy. The "Notice of Occurrence" provision in the policies provides that whenever OCF can "reasonably conclude" that an occurrence is likely to involve the policies, it is to notify the insurers "as soon as practicable."[16] OCF notified these defendants as soon as it could reasonably conclude that these defendants' policies were likely to be reached. As set forth in the affidavit of Gregory A. Peterson, OCF"s Insurance Manager, OCF signed the Wellington Agreement in June 1985. (Peterson Aff. paragraph 5.) This agreement confirmed products insurance coverage for asbestos claims between a number of insurers and OCF. (*Id.*) Under the agreement, OCF was to draw down on its products coverage in the 1952 to 1977 period before calling on the policies it had for the 1977 to 1984 period. (*Id.* at paragraph 6.) In October 1989, OCF was approaching the end of its products coverage, provided by the Wellington Signatory carriers in the 1952 to 1977 time period, and elected to begin drawing on its 1977–1978 policies. (*Id.* at paragraph 7.)

In June 1990, although OCF still had $60,000,000 of unconsumed products insurance coverage in the 1952 to 1977 block, OCF added the 1978–1979 policies to the block of coverage from which it was drawing. (*Id.* at paragraph 9.) In July 1990, OCF could reasonably conclude that the 1979–1980 policies would be reached. On July 27, 1990, Peterson sent a letter to ACIC and PNIC which indicated OCF's "best estimate" of when these defendants' policies were likely to be reached. The letter stated, in part:

"As you are aware, [OCF] has been a defendant in asbestos-related personal injury cases for many years. The excess liability policies issued by your company to [OCF] specifically apply to such claims. The purpose of this letter is to

---

**16.** Policy Binder, Exhibits A at 7; B at 65; C at 156; D at 224; E at 295; F at 388.

describe with greater particularity the current status of the asbestos litigation and our best *estimate* of when the excess policies your company sold to [OCF] will first be called upon to pay for such asbestos cases." (Emphasis added.) (Exhibit Binder at 523.)

Each letter also indicated that OCF did not expect to reach the 1979–1980 policies until 1992. As predicted, OCF did not call on the 1979–1980 policies until April 1992.[17]

This court finds that, in light of all the surrounding facts and circumstances, OCF notified these defendants in a timely manner as prescribed by the policies. Under the policies, OCF is required to notify these defendants as soon as practicable once it is able to reasonably conclude that defendants' policies were likely to be reached. OCF did this. Once OCF was able to estimate with some certainty when the large amounts of underlying insurance would be exhausted and these defendants' policies reached, it notified them within a reasonable time.[18]

In order to determine the timeliness of OCF's notice, in addition to considering the amount of insurance which was exhausted before OCF gave notice, this court will consider the prejudice, if any, suffered by these defendants. Although prejudice is not required to preclude coverage due to untimely notice of a claim, it can be used in weighing whether notice was timely. See *Am. Employers, supra.*

■ An insurer is prejudiced by untimely notice when it is denied the opportunity to investigate a claim and thereby protect its right by asserting a defense. See *W. Am. Ins. Co.*, 59 Ohio App.3d 71, 571 N.E.2d 449. Therefore, if the notice given to the insurer allows it a sufficient opportunity to investigate a claim and protect its rights, then notice is timely.

■ In the instant case, OCF gave notice to these defendants before the claims they were asked to indemnify were even asserted against OCF.[19] These

---

**17.** This court would also note that OCF reached the subsequent policy years as follows:
Began drawing on 1980–1981 policies in August 1992.
Began drawing on 1981–1982 policies in November 1992.
Began drawing on 1982–1983 policies in April 1993.
Began drawing on 1983–1984 policies in January 1994.

**18.** Some jurisdictions have found that notice was timely even when the insured waited until it could certify that claims had already been filed against all of the underlying insurance. See *Paramount Communications, Inc. v. Gibraltar Cas. Co.* (1994), 204 A.D.2d 241, 612 N.Y.S.2d 156. Here, OCF notified defendants of their potential obligations two years before all the previous years' insurance was exhausted.

**19.** OCF is seeking indemnification only for claims asserted against it after the filing of this declaratory action, *i.e.*, after notice was given.
These defendants assert that this reasoning is an improper basis upon which to find that notice was timely. Defendants argue that, if this were applied, insurers would never get notice of claims until they were asked to pay.

defendants would have, therefore, had ample opportunity to protect their interests by investigating the claims and asserting a defense against them. ACIC and PNIC, however, chose not to participate in any way with the adjudication of these claims. In fact, they have continually denied their obligations to provide coverage throughout this litigation. This court fails to see how earlier notice to these defendants would have benefitted them. There is no reason for this court to believe that defendants would have actually done anything different if notified earlier. This court, therefore, finds that ACIC and PNIC were not prejudiced in any way by the timeliness of OCF's notice.[20]

Arguments that OCF should have known earlier that these defendants' policies would be reached are unavailing. The notice provision further provides that OCF's "failure to give notice of any occurrence which at the time of its happening did not *appear* to involve this Policy, but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims." (Emphasis added.) Under this provision, even if OCF should have been able to reasonably conclude at an earlier time that the asbestos claims, which had not yet even been asserted against OCF, would reach these defendants' policies, its failure to do so does not prejudice its right to coverage. The reason being, it is mere speculation whether claims will reach defendants' excess layers. Therefore, although the number of occurrences does not initially appear to effect these defendants' policies, once the situation changes and OCF provides notice that their policies will be affected, any alleged untimeliness will not permit defendants to avoid coverage.

These defendants attempt to establish that there is, nevertheless, a material issue of fact regarding whether the notice given them was timely. Defendants offer the affidavit testimony of Ralph C. Hemp for the proposition that "it is

---

This court finds fault with defendants' thinking, however. In this instance, it is not as though the claims against OCF had already been adjudicated. The purpose of timely notice is to give the insurer an opportunity to pose a meaningful defense. Because these defendants are asked to provide coverage only for claims asserted after notice was given, they were given a meaningful opportunity—but chose not to pursue it.

**20.** Defendants assert that they have been prejudiced and want the court to consider this in determining whether notice was timely. First, they assert OCF's signing of the Wellington Agreement prejudiced them. This court, however, finds that these defendants' rights were not compromised by the signing of the Wellington Agreement. No claims were settled that they were asked to pay for and no defenses were waived. This court fails to see how ACIC and PNIC feel they are entitled to advance notice of an agreement between OCF and its other insurers, where, as here, these defendants had no part in the negotiations.

Second, PNIC asserts that it was prejudiced because it commuted its reinsurance before it knew about OCF's claims. This court finds, however, that the internal financial affairs are not a protected factor of the timeliness requirement. Timely notice is required so that insurers can estimate, once a claim has been filed, how much needs to be earmarked for that claim; however, this situation is markedly different from the one sought to be protected.

customary practice in the insurance industry to provide notice of claims to such excess carriers at least by the time the paid losses plus the reserves (the 'incurred losses') reach fifty percent (50%) of the retention of limits underlying such excess coverage." (Hemp Aff. paragraph 3, Defendants' Exhibit Appendix at 718.) Furthermore, Hemp testified that "notice of OCF's asbestos product liability losses should have been provided to the defendants no later than February 1984 when Marsh & McLennan noted the incurred losses had exceeded the underlying retained limits for each policy year from 1979 to 1982 using the 'first manifestation' theory of coverage." (*Id.,* paragraph 4.)

This court finds that Hemp's testimony does not create an issue of material fact for a jury to consider. Even if Hemp's recitation of the industry standard was correct, his analysis is faulty, as the defendants have not provided this court with any evidence indicating that fifty percent of the insurance underlying *these defendants* was exhausted at a time prior to their actually receiving notice.

Hemp bases his opinion on a letter written by G.L. Gibson of Marsh & McLennan, dated February 2, 1984.[21] As Hemp indicates, the letter does state OCF had exceeded the underlying retained limit; however, the underlying retained limit is described as "$1,000,000/$35,000,000." As will be shown later in this court's opinion, the reference clearly indicates that Gibson is referring to the Aetna umbrella policy.

The Aetna policy, or self-insurance policy, during 1979 to 1982, provided coverage only up to $35,000,000 total. The defendants, however, do not provide coverage until $150,000,000 of underlying insurance has been exhausted (this includes primary, umbrella and excess insurance). Therefore, even though at least $35,000,000 of coverage was exhausted in 1984, in each policy year between 1979 and 1982, presumably $115,000,000 (approximately) of underlying insurance remained available. Since defendants have not offered any evidence of when fifty percent of the insurance underlying these defendants was exhausted, this court finds that there exists no question of fact regarding OCF's timeliness of notice.

Based on the facts and circumstances of this case, this court finds that, as a matter of law, OCF provided Associated, ACIC and PNIC timely notice of their likelihood of responsibility.

### E. *TRIGGER OF COVERAGE*

This matter is before the court on the motions of OCF and Associated

---

21. This exhibit was inadvertently omitted from the Defendants' Exhibit Appendix; however, the copy is marked "Exhibit 2 Hemp Aff."

regarding trigger of coverage.[22] Upon due consideration of the pleadings, memoranda of counsel, evidence, and applicable law, the court grants OCF's motion and denies Associated's motion.

In some instances, the debilitating effects from inhalation of asbestos manifest themselves many years after initial exposure. In an attempt to reconcile policy language with the, arguably, progressive nature of asbestos-related injuries, courts have found a number of different circumstances to be the points at which coverage is triggered. This question of what event or events trigger coverage for the defendants' policies is before this court.

▪ OCF asks this court to declare that under defendants' policies the "continuous injury" or "triple trigger" rule applies to asbestos claims.[23] Under this rule, bodily injury is deemed to occur throughout the period beginning with the claimant's first exposure to asbestos and continuing until the claimant is diagnosed with an asbestos-related condition. Accordingly, any policy in effect during that continuous injury period would be triggered and could be called upon by OCF to provide coverage.

▪ Associated requests that the court declare that the "exposure" theory of coverage applies. Under the "exposure" theory, the only trigger of coverage for asbestos claims is actual exposure to asbestos. See, e.g., *Ins. Co. of N. Am. v. Forty–Eight Insulations, Inc.* (C.A.6, 1980), 633 F.2d 1212. This theory does not trigger only the initial year of exposure; rather, it triggers coverage each year a person is exposed to asbestos.

▪ In their response, ACIC and PNIC urge this court to declare that the "injury-in-fact" trigger of coverage applies to these defendants' policies. The "injury-in-fact" application establishes that an "insured [must] prove the cause of the occurrence (accident or exposure), the result (injury, sickness, or disease), and that the result occurred during the policy period." *Am. Home Products Corp. v. Liberty Mut. Ins. Co.* (S.D.N.Y.1983), 565 F.Supp. 1485, 1497. Alternatively, ACIC and PNIC argue that "continuous injury" cannot be the designated trigger of coverage for asbestos claims without first having a trial on the medical evidence. ACIC and PNIC offer medical testimony in an attempt to create an issue of fact regarding the progressive nature of asbestos-related conditions.

---

22. As held previously, although ACIC and PNIC filed a "cross-motion" on this issue, contemporaneously with their memorandum in opposition to OCF's motion, this court will not treat ACIC and PNIC's response as a motion, as it was not timely filed.

23. OCF's interim agreement with Aetna regarding payment of asbestos claims does not in any way bar OCF from asserting the "continuous injury" trigger of coverage in this case.

As an initial matter, however, this court finds that the declaration of the applicable trigger of coverage under these defendants' policies, as to asbestos-related claims, is an appropriate matter to be decided by summary judgment. Clearly, a declaration of the meaning of the policy language is a matter for this court to determine because it is based upon the plain meaning of the policy provisions and upon a review of relevant case law which has analyzed the meaning of similar policy language. The issue of how the policy language applies to asbestos-related claims, however, is dependent upon the nature of asbestos-related injuries. Therefore, ACIC and PNIC attempt to create an issue of fact regarding the ·characteristics of asbestos-related injuries. This court finds that ACIC and PNIC have failed to present a genuine issue for trial.

Viewing the medical evidence .in a light most favorable to ACIC and PNIC, there may exist a dispute regarding what precise conditions provoke the growth of cancer. It is also obvious that not every exposure to asbestos results in cancer, such as mesothelioma and bronchogenic carcinoma. However, it is absolutely undisputed that once asbestos fibers are inhaled into the lungs, although many fibers are eliminated through the natural defense mechanisms of the respiratory system, some of the fibers lodge permanently in the lung tissue. According to ACIC and PNIC's experts, the fibers that are not removed cause immediate injury to the cells and tissues. This injury causes inflammation and scarring. The inflammation may eventually subside and the injured person may never experience more severe affects of asbestos exposure; however, the injury is already permanent. The bodily injury is continuous because the presence of the asbestos fibers, the scarring, and, perhaps, a diminished lung capacity are all permanent conditions.

This court, therefore, is not concerned with the distinction that all persons exposed to asbestos do not experience malignant diseases as a result of such exposure. This information does not change the fact that in every instance of asbestos exposure there is immediate injury which continues, with some degree of severity, throughout a person's life. Accordingly, this issue is appropriate for summary judgment.[24]

 As the court has now determined that there is no issue for trial, the court must consider what is the triggering event or events under the defendants' policies. Once the triggering event is determined, this court will determine which

---

24. This court is not alone in its holding that asbestos-related injuries are continuous, and often progressive. See, *e.g., Keene Corp. v. Ins. Co. of N. Am.* (C.A.D.C.1981), 667 F.2d 1034; *Owens–Illinois, Inc. v. Aetna Cas. & Sur. Co.* (D.D.C.1984), 597 F.Supp. 1515; *ACandS, Inc. v. Aetna Cas. & Sur. Co.* (C.A.3, 1985), 764 F.2d 968; *J.H. France Refractories Co. v. Allstate Ins. Co.* (1993), 534 Pa. 29, 626 A.2d 502; *Borel v. Fibreboard Paper Prods. Corp.* (C.A.5, 1973), 493 F.2d 1076.

application ("continuous injury," "exposure," or "injury-in-fact") will be applied to OCF's asbestos-related claims.

If a policy term has a plain meaning, "it is neither necessary nor permissible to resort to [rules of] construction unless the plain meaning would lead to an absurd result." *Olmstead v. Lumbermens Mut. Ins. Co.* (1970), 22 Ohio St.2d 212, 216, 51 O.O.2d 285, 288, 259 N.E.2d 123, 126. Here, the plain meaning of the relevant provisions provides that defendants' policies are triggered so long as some "personal injury" occurs during the policy period.

Associated, ACIC, and PNIC are obligated, through the underlying policies to which they follow form, to provide OCF coverage for its liabilities "because of PERSONAL INJURY * * * caused by an OCCURRENCE." An "occurrence" is defined as "an accident or event including continuous or repeated exposure to conditions, which *results,* during the policy period, in PERSONAL INJURY." (Emphasis added.) (Policy Binder, Exhibits A at 16; B at 72; C at 163; D at 230; E at 303–04; F at 466.) Based on this language any personal injury during the policy period triggers coverage.

The key issue is, therefore, when does personal injury in asbestos-exposure cases occur? "Personal injury" is defined in the policies as "bodily injury, sickness, disease, disability or shock, including death at any time * * * which occurs during the policy period." *Id.* Webster's Ninth New Collegiate Dictionary (1985) 164, 623, 1094, 362, 359, provides the following definitions of the terms in the "personal injury" definition[25]:

| | | |
|---|---|---|
| bodily | - | "of or relating to the body" |
| injury | - | "an act that damages or hurts" |
| sickness | - | "ill health; a disordered, weakened, or unsound condition" |
| disease | - | "a condition * * * that impairs the performance of a vital function" |
| disability | - | "a condition of being disabled" |

---

As seen by Associated's, ACIC's, and PNIC's arguments, some insurers urge that the occurrence of asbestos-related injuries should be limited to a single temporal point, such as when the asbestos was inhaled ("exposure"). These

---

**25.** Ohio courts have long looked to Webster's dictionaries for definitions of policy terms and conditions. See, *e.g., Home Indemn. Co. v. Plymouth* (1945), 146 Ohio St. 96, 101, 32 O.O. 30, 32–33, 64 N.E.2d 248, 250; *Fuerstenberg v. Mowell* (1978), 63 Ohio App.2d 120, 123, 17 O.O.3d 306, 307–308, 409 N.E.2d 1035, 1036–1037.

arguments, however, are inconsistent with the policy language. The policy uses, in the disjunctive, the quite different terms "bodily injury," "sickness," "disease," or "disability," as well as "death." These words convey a wide array of meanings, from the modest notion of "physical harm" to the more palpable condition of having an "illness" to the more formal and definitive "disease" and on to the resulting infirmity of a "disability" and the finality of "death." As defined in the policies, "personal injury" includes anything and everything on the continuum from physical harm to sickness to disease to disability to death. And, so long as there is some "personal injury" during the policy period, the policy is triggered.

The application of the "continuous injury" rule to asbestos claims covered by this policy language is a natural fit. The continuous injury process begins with some injury to the body, however minute, at the point of initial exposure. The initial damage persists and the remaining injury continues and later may progress to the stages of disease, disability, or death. For purposes of coverage, all policies are triggered that fall within the "continuous injury" period from first exposure to death or diagnosis.

The "continuous injury" rule was first adopted by the United States Court of Appeals for the District of Columbia Circuit in *Keene, supra.* In *Keene,* at least nine different insurance companies filed separate motions for summary judgment, many taking varying approaches to the same boilerplate policy language. 667 F.2d at 1037. Some argued that coverage was triggered only for a policy in effect when the claimant was exposed to asbestos fibers; others took an opposing view, asserting that only the policy in place when the claimant's disease became manifest or diagnosed was triggered.

The District of Columbia Circuit rejected those inconsistent limiting theories of coverage—known as "exposure" and "manifestation"—and instead embraced what is now known as the "continuous injury" rule. The court held that there was "injury" within the meaning of the policies beginning at the point of initial "inhalation exposure," continuing while asbestos fibers were lodged in the body during "exposure in residence," and following up to the point of "manifestation" or discovery of a particular disease. *Id.,* 667 F.2d at 1045–1046. The court held that " 'bodily injury' * * * means[s] any part of the single injurious process that asbestos-related diseases entail." *Id.,* 667 F.2d at 1047.

The *Keene* "continuous injury" rule was swiftly applied under Ohio law in *O–I v. Aetna, supra.* Based on an extensive analysis of Ohio law, the district court granted Owens–Illinois' motion for summary judgment and held that the insurer's "duty to indemnify * * * was * * * triggered if a policy was in effect at any point in time between a claimant's initial exposure to asbestos and manifestation of the injury." *Id.,* 597 F.Supp. at 1524.

Since *Keene,* a number of other jurisdictions have adopted the "continuous injury" rule. The Third Circuit panel in *ACandS v. Aetna, supra,* unanimously affirmed a decision granting summary judgment and specifically ruled that a medical record was not necessary. *Id.,* 764 F.2d at 972. In *J.H. France, supra,* the Supreme Court of Pennsylvania unanimously adopted the *Keene* approach and affirmed a grant of summary judgment on the issue. The Pennsylvania Supreme Court decided that "[r]ather than selecting one or another of the phases [of injury] as the exclusive trigger of liability, it seems more accurate to regard all stages of the disease process as bodily injury sufficient to trigger the insurers' obligation to indemnify, as all phases independently meet the policy definition of bodily injury." *J.H. France,* 534 Pa. at 38, 626 A.2d at 507. The New Jersey Appellate Division took the same approach when it upheld a grant of summary judgment on this issue. *Owens–Illinois, Inc. v. United Ins. Co.* (App.1993), 264 N.J.Super. 460, 506–507, 625 A.2d 1, 25.

The "continuous injury" rule, which had been adopted as consistent with Ohio law in *O–I v. Aetna,* was also applied on summary judgment by at least one Ohio court. In *Morton Thiokol, Inc. v. Aetna Cas. & Sur. Co.* (Dec. 28, 1988), Hamilton C.P. No. A–8603799, unreported, the Hamilton County Common Pleas Court granted summary judgment in favor of the policyholder seeking coverage for asbestos-related personal injury claims. Finding there to be no genuine issue as to any material fact, the court held:

"Morton Thiokol is entitled to assign each asbestos claim to any Aetna policy in effect during the period beginning with the date of the asbestos claimant's initial inhalation of asbestos fibers through the date of the asbestos claimant's death or filing suit * * *." Slip op. at 2.

The insurer ultimately satisfied the trial court's judgment and dismissed its appeal.

As indicated, case law suggests that Ohio is a jurisdiction which recognizes and applies the "continuous injury" rule when determining coverage for asbestos claims.[26] Accordingly, based on the above case law, the policy language, and the nature of asbestos-related injuries, this court finds, as a matter of law, that the "continuous injury" rule applies to the defendants' policies. The defendants'

---

26. The court in *Unigard Sec. Ins. Co. v. N. River Ins. Co.* (S.D.N.Y.1991), 762 F.Supp. 566, in fact, identified Ohio as a jurisdiction that embraces the "continuous injury" or "triple trigger" rule:

"At the time the Wellington Agreement was signed, a federal court construing Ohio law predicted that the 'triple trigger' would be applied by the court of Ohio. *Owens–Illinois, Inc. v. Aetna Cas. & Sur. Co.,* 597 F.Supp. 1515, 1521 (D.D.C.1984). That prediction has prove[n] accurate. See *Morton Thiokol, Inc. v. Aetna Cas. & Sur. Co.,* No. A–8603799, slip op. at 2 (Ohio Ct.C.P. Dec. 28, 1988) (Order granting partial summary judgment on coverage trigger)." 762 F.Supp. at 590.

policies will, therefore, be triggered at any point along the continuum of injury from initial exposure to asbestos until diagnosis or death.

This court specifically rejects the more limited applications of the "exposure" theory or the "injury-in-fact" rule because neither theory fully takes into account the policy language or the nature of asbestos-related injuries. Both theories are inconsistent with the policy language that anticipates providing coverage throughout the continuum of an injury process. They overlook the fact that, according to the policy language, there is no limit to the number of injuries that may result from a single occurrence. Furthermore, it is uncontroverted that once exposed to asbestos, the injury remains with the individual always. "Exposure" and "injury-in-fact" interject the notion that the policies require injury be new or additional in order to trigger a policy—this is not the case. The policy merely requires that some injury result during the relevant policy period.

Regarding the "exposure" theory, in particular, the policy does not define "personal injury" to mean "exposure to the cause of injury." If such a definition had been used, perhaps the exposure theory would make sense.[27] Associated's policy, however, states that coverage is triggered so long as any bodily injury, sickness, or disease occurs during the policy period, not exposure.

Associated's assertions, that "exposure" is the application adopted in Ohio, are inaccurate. Associated's primary cases in support of its argument either did not apply Ohio law, or did not consider policy language identical to the language in defendants' policies. *Forty–Eight Insulations, supra,* for example, is a Sixth Circuit decision that applied the "exposure" theory to cases involving issues of insurance coverage of asbestos claims. This Sixth Circuit case, however, purported to apply New Jersey and Illinois law. Both New Jersey and Illinois appellate courts, however, have rejected the approach taken in *Forty–Eight Insulations.* See *O–I v. United, supra,* 264 N.J.Super. at 508–509, 625 A.2d at 26; *Zurich Ins. Co. v. Raymark Indus.* (1987), 118 Ill.2d 23, 56–57, 112 Ill.Dec. 684, 699, 514 N.E.2d 150, 165.

Associated additionally cites *B.F. Goodrich v. Am. Motorists Ins. Co.* (May 22, 1986), N.D.Ohio No. C84–1224A, unreported, 1986 WL 191786, as an Ohio case which adopts the "exposure" theory. The policies in *B.F. Goodrich,* however, were markedly different from Associated's policy. The *B.F. Goodrich* policies did

---

27. The drafters of the insurance industry's boilerplate originally considered "proposed language" with words such as "exposure" or "contact with the means of injury," but "chose not to adopt such language." *Asbestos Ins. Coverage Cases* (Jan. 24, 1990), Cal.Super., Judicial Council Coordination Proceeding No. 1072, Decision Concerning Phase III Issues, slip op. at 38. This court is unwilling to recognize the more limiting concept of the "exposure" theory, after the insurance industry already considered and rejected policy language which would have specifically designated exposure to be the trigger of coverage.

not key the trigger to the timing of the claimant's injury and did not define the word "occurrence." As a result, the court concluded that " '[o]ccurrence,' undefined, mean[t] the cause of injury; and thus, *in this case,* the trigger of coverage [was] the exposure which cause[d] personal injury regardless of the time of the injury." (Emphasis added.) *Id.,* slip op. at 11. Due to the factual differences, this court does not recognize the holding in *B.F. Goodrich* to be persuasive.

In summation, this court rejects both the "exposure" theory of coverage and the "injury-in-fact" theory and holds that, as a matter of law, the "continuous injury" rule applies to the defendants' policies. The defendants' policies will, therefore, be triggered at any point along the continuum of injury from initial exposure to asbestos until diagnosis or death.

### F. *PERCENTAGE OF COVERAGE ALLOCATED TO EACH INSURER (SCOPE OF COVERAGE)*

This matter is before the court on all parties' motions regarding the scope of each insurer's coverage. Upon consideration of the pleadings, memoranda of counsel, evidence and applicable law, the court grants OCF's motion and denies the motions filed by the defendants.

The issue to be decided by this court is based on the premise that many insurers' policies may be triggered by a single claim. This situation arises for two reasons. First, an occurrence which gives rise to coverage may take place over a number of years. Hence, any insurer on the risk during those years of occurrence would have its policy triggered. This would potentially result in multiple insurers being obligated to pay on a single claim. Second, once an excess layer is pierced, there is available any number of excess carriers in that layer which could be called upon to provide coverage on a claim.

OCF argues that, pursuant to the policy provisions, each defendant is obligated to pay the full amount of OCF's liability on a claim. OCF asserts that this obligation to pay is not excused or limited by the existence of other insurers which may also be obligated to provide coverage for the same claim under a separate policy. Furthermore, OCF asserts that even though it has many insurers that could be called on for coverage on any particular claim, it is within OCF's discretion to determine which *one* will be required to fully indemnify OCF for its liability. In summation, OCF argues that all the carriers agreed to be liable for "all sums which [OCF] shall be obligated to pay." The policy does not express that the carriers' obligations are limited to only a pro rata share of that liability.

To the contrary, Associated, ACIC and PNIC argue [28] that, based on the policy language, each of the following applies: (1) each carrier is liable only for the portion of injury that occurred during its policy period; (2) because the policies cover only bodily injury occurring during the policy period, OCF is responsible for its pro rata share of liability during periods of injury where there was no insurance coverage; and (3) co-insurers sharing the same layer of excess insurance should pay only in proportion to their respective policy limits. When an injury triggers multiple policies, each insurer is responsible only for a prorated amount of the liability. The defendants suggest that the proration would be computed based upon the percentage of years, during the period of occurrence, in which the insurer provided coverage.[29] Similarly, if there was no insurance for some portion of the injury, then OCF would have to pay that percentage of liability itself. Additionally, co-insurers sharing the same layer of excess insurance should pay only, on an individual claim, the percentage of coverage each carrier provides within its layer.[30] In summation, the defendants argue that the policies do not give the insured the right to select which single policy will entirely respond to a claim triggering multiple policies, nor do they impose a duty on the insurer to fully indemnify OCF for liability arising in part during uninsured periods, or during periods where other insurance is available.

As an initial factor, in Ohio, an insured has the burden of showing facts sufficient to prove a loss and entitlement to coverage under the policy. *Inland Rivers Serv. Corp. v. Hartford Fire Ins. Co.* (1981), 66 Ohio St.2d 32, 34, 20 O.O.3d 20, 21–22, 418 N.E.2d 1381, 1383; *Sterling Merchandise Co. v. Hartford Ins. Co.* (1986), 30 Ohio App.3d 131, 137, 30 OBR 249, 255, 506 N.E.2d 1192, 1198. This court finds that OCF can establish its entitlement to coverage and is permitted to, at its discretion, pursue its remedy in full against *one* insurer, regardless of the existence of other triggered policies. Furthermore, in the event that portions of the occurrence took place during uninsured periods, OCF is not required to contribute a pro rata share to the selected insurer. Finally, the right of dueling excess insurers to have obligations prorated between themselves does not affect a policyholder's right to full contribution from the insurer of its choice.

---

**28.** Although Associated, ACIC and PNIC filed separate motions on this issue, their arguments are so overlapping that, for clarity, the court will consolidate their arguments.

**29.** To illustrate, if the occurrence which gave rise to coverage took place over a twenty-year period of time, then an insurer that was on the risk for only one of those twenty years would be responsible to OCF for only 1/20 of the liability.

**30.** For example, if there are four insurers in a $1,000,000 layer of insurance, three insurers providing coverage up to $300,000 each and one insuring up to $100,000, then the three insurers would each pay thirty percent of the liability and the other would pay ten percent.

### 1. *Policyholder is Entitled to Full Recovery from Insurer of Its Choice*

■■■ OCF asserts that, according to the policy, it is entitled to full coverage on an individual claim from any of the defendants.[31] The language in the policies OCF relies on for this contention provides that the defendants are obligated to:

"indemnify the INSURED for * * * *all sums which the INSURED shall be obligated to pay* by reason of the liability imposed upon the INSURED by law * * * because of *PERSONAL INJURY,* PROPERTY DAMAGE, or ADVERTISING LIABILITY to which this policy applies, caused by an OCCURRENCE * * *." (Emphasis added.) Insuring Agreement II.A. of the Northbrook Umbrella Liability Policy (Policy Binder, Exhibit C at 163).[32]

To determine the effect of this language, this court relies on the treatment by other courts of similar policy language. In *J.H. France, supra,* the court held that under the policy, "the insurer contracted to pay *all sums* which the insured becomes legally obligated to pay, not merely some pro rata portion thereof." *Id.* 534 Pa. at 39, 626 A.2d at 507. The court also found that there was "*nothing* in the policies that provide[d] for a reduction of the insurer's liability if any injury occur[red] only in part during a policy period." *Id.,* 534 Pa. at 39, 626 A.2d at 508.

The defendants set forth a number of unpersuasive cases which, after adopting exposure as the trigger of coverage, found that proration of insurance coverage was reasonable. See, *e.g., Forty–Eight Insulations, supra,* 633 F.2d at 1225. This court, however, recognizes the rules that have been applied in Ohio and in other jurisdictions that have decided the issue of whether, even though multiple policies are triggered, only one of the triggered insurers is required to pay the insured in full. Those courts have held that the insured has the discretion to choose which one of many triggered insurers will be required to pay. See *Commercial Cas. Ins. Co. v. Knutsen Motor Trucking Co.* (1930), 36 Ohio App. 241, 245, 173 N.E. 241, 242 [33]; see, also, *Keene,* 667 F.2d at 1049; *Owens–Illinois, Inc. v. Aetna Cas. & Sur. Co.* (1984), 597 F.Supp. 1515, 1524; *J.H. France,* 534 Pa. at 39–41, 626 A.2d at 508. Furthermore, once an insurer is chosen, that

---

**31.** OCF does not suggest that it should be able to recover in full on each claim from every triggered policy; rather, OCF argues that it is entitled to only one full recovery from the triggered insurer of its choice.

**32.** The policy language is identical throughout the Northbrook and Transit policies at issue, to which each defendant follows form.

**33.** The defendants argue that the law in *Knutsen* is inapposite to the case at hand because the issue in *Knutsen* involved automobile insurance coverage, not asbestos insurance. This court, however, finds the situation in *Knutsen* to be analogous to the case at hand. In *Knutsen,* the court was faced with the question of how to allocate liability to two insurers on the risk for the same occurrence—this is precisely the issue this court must consider.

insurer is required to pay in full, up to its policy limits, the amount of the insured's liability. See *Knutsen,* 36 Ohio App. at 245, 173 N.E. at 242 ("the [insured] has the right to enforce the obligation * * * in its entirety against either of the [insurers], * * * and collect the whole amount from that one"); see, also, *J.H. France,* 534 Pa. at 42, 626 A.2d at 509 ("any policy in effect during the period from exposure through manifestation must indemnify the insured until its coverage is exhausted"); see, also, *Keene,* 667 F.2d at 1050 ("the primary duty of the insurers whose coverage is triggered by exposure or manifestation is to ensure that [the insured] is indemnified in full").

While the defendants assert that the meaning of the "all sums" language is affected by other provisions in the policy, they do not offer any case law in support of their proposition. Instead, the defendants assert that the definitions of "occurrence" and "personal injury," as well as the "other insurance" clause, clearly indicate that the phrase "all sums" does not give the insured the right to require a single policy to respond to a claim that triggered multiple policies. "Occurrence" and "personal injury" are defined in the definitions section of the policies as follows:

"OCCURRENCE shall mean an accident or event * * * which results, *during the policy period,* in PERSONAL INJURY * * *." (Emphasis added.)

and

"PERSONAL INJURY means * * * bodily injury, sickness, disease * * * which occurs *during the policy period* * * *." (Emphasis added.)

Because the policy states that an insurer is liable only for injuries that occur "during the policy period," the defendants argue that when an injury triggers multiple policies, each insurer is responsible only for the portion of injury that occurred during its policy period.

This court finds, however, that defendants' reliance on these definitions is misplaced. The definitions of "occurrence" and "personal injury" prescribe the circumstances under which the policy will be triggered; they do not limit the coverage owed by each defendant once its policy is triggered.

■ The defendants assert that the "other insurance" clause requires pro rata allocation of each insurer's obligation to pay.[34] This court, however, finds

---

34. The "Other Insurance" clause contained in each policy reads as follows:
 "If other valid and collectible insurance with any other insurer is available to the Insured covering a loss also covered by this Policy, other than insurance that is in excess of the insurance afforded by this Policy, the insurance afforded by this Policy shall be in excess of and shall not contribute with such other insurance." Associated Excess Policy (Policy Binder, Exhibit A at 7); Subscription Policy, Condition No. 3 (Policy Binder, Exhibits B at 66; C at 157; D at 225; E at 296); Condition No. 4 (Policy Binder, Exhibit F at 388).

that the provision does not indicate that proration of obligations must occur. Rather, this provision merely indicates that OCF must exhaust all other valid and collectible insurance before the insurer will become obligated. Additionally, the provision comes into effect when determining the rights and duties of competing excess insurers.

In some situations, "other insurance" clauses can indicate that an insurer is liable for only its proportion of the loss. For instance, in *Farm Bur. Mut. Auto. Ins. Co. v. Buckeye Union Cas. Co.* (1946), 147 Ohio St. 79, 33 O.O. 259, 67 N.E.2d 906, the "other insurance" clause mandated that claims were to be apportioned.[35] When, as in *Farm Bureau*, the requirement for pro rata allocation is indicated, the Supreme Court of Ohio held that an insurer who pays off the entire liability is nothing more than a mere volunteer and is not entitled to contribution. *Id.* at paragraphs six and eight of the syllabus. The importance of this rule is that, if the policy provides for proration, it must be done before the insured gets paid. Otherwise, the insurer paying the full liability has voluntarily undertaken to pay more than its fair share and, as such, equity will not aid a volunteer. *Id.* at paragraph seven of the syllabus. The "other insurance" clauses in defendants' policies, however, are distinguishable from the clause in *Farm Bureau*, as they contain nothing regarding allocation of percentages or proportions to be paid by each insurer.[36]

This court finds that OCF has proven its entitlement to coverage. See *Inland Rivers, supra.* As indicated by Ohio law and the policies, this court holds that once an occurrence triggers the defendants' policies, each defendant is required to provide coverage, in full, for all sums which OCF becomes liable to pay. See *Knutsen, supra.* OCF is, however, limited to only one recovery. Furthermore, this court holds that it is within OCF's discretion to select which triggered policy

---

**35.** *Farm Bureau* involved two insurers that were seemingly liable on the same accident. One insurer paid off the entire loss and then sought contribution from the other insurer. The applicable policies contained "other insurance" clauses, which read as follows:

"'If the insured has other insurance against a loss covered by this policy, the company *shall not be liable* under this policy *for a greater proportion* of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss.'" (Emphasis added.) *Farm Bureau* at 89, 33 O.O. at 263, 67 N.E.2d at 911.

Based on this provision, the court found each insurer to be responsible only for its pro rata share of loss. Therefore, the court held that "[i]f the policy of each of several insurers limits its liability to such proportion of a loss as the amount insured by such insurer bears to the total applicable limit of liability of all valid and collectible insurance against such loss, the payment by one insurer of more than its proportion of a loss creates no right to contribution from the other insurers." *Farm Bureau*, paragraph eight of the syllabus.

**36.** The court notes that, had the defendants desired to limit their percentage of liability on a single claim to only a portion of the injuries sustained, they could have provided for such in the policies—but they did not.

will be obligated to pay in full on a particular claim. See *Knutsen; Keene; O–I v. Aetna; J.H. France.*

### 2. *OCF Has No Obligation to Contribute a Pro Rata Share*

 Defendants allege that OCF should be required to contribute its pro rata share of liability, including defense expenses, for periods of occurrence when there is no insurance coverage. This court finds that nothing in the policies allow for proration of liabilities, or defense costs, to OCF.

Defendants point this court to *Forty–Eight Insulations,* which found that "it is reasonable to treat [the manufacturer] as an insurer for those periods of time that it had no insurance coverage." 633 F.2d at 1225. This court, however, finds the reasoning in *Forty–Eight Insulations* to be unpersuasive. As the Pennsylvania Supreme Court held, such a "judicial fiction * * * cannot be supported":

" 'We have no authority upon which to pretend that [the manufacturer] also has a "self-insurance" policy that is triggered for periods in which no other policy was purchased. Even if we had the authority, what would we pretend that the policy provides? What would its limits be?' " *J.H. France,* 534 Pa. at 40, 626 A.2d at 508 (quoting *Keene,* 667 F.2d at 1048–1049).

This court is also unwilling to partake in such a "judicial fiction" as to consider OCF an insurer in uninsured periods.[37] Therefore, this court finds that neither the liability nor the defense costs will be prorated to OCF.[38]

### 3. *The "Other Insurance" Provisions Affect Excess Insurers Only*

 Defendants argue that obligations must be prorated to each insurer within the same layer of excess insurance. The defendants assert that co-insurers sharing the same layer of excess insurance should pay, on an individual claim, only the percentage of coverage each carrier provides within its layer. Furthermore, the defendants argue that this allocation must occur before OCF receives coverage. Therefore, for instance, when a claim reaches Associated's layer of excess insurance, Associated would be required to pay OCF only fifteen percent of that claim. The other eighty-five percent would have to be collected by OCF from the other co-insurers in Associated's level.

---

**37.** Furthermore, this court would also note that the "other insurance" clause cannot be used to impose liability on a policyholder. *Detrex Chem. Indus. v. Employers Ins.* (N.D.Ohio 1990), 746 F.Supp. 1310, 1325–1326.

**38.** This ruling in no way affects the insurers' rights to seek contribution or proration of liabilities or defense expenses between themselves—whether it be pursuant to an "other insurance" clause or otherwise.

This court finds that the "other insurance" clauses do provide that competing excess insurance companies will have their liabilities apportioned between them. This apportionment, however, in no way affects the amount of recovery the insured is entitled to receive from any one insurer. The Supreme Court of Ohio has held:

"[W]here two insurance policies cover the same risk and both provide that their liability with regard to that risk shall be excess insurance over other valid, collectible insurance, the two insurers become liable in proportion to the amount of insurance provided by their respective policies." *Buckeye Union Ins. Co. v. State Auto. Mut. Ins. Co.* (1977), 49 Ohio St.2d 213, 218, 3 O.O.3d 330, 333, 361 N.E.2d 1052, 1055. *Buckeye Union* was a declaratory judgment action that resolved the liability of two competing excess carriers. There was no indication that the Supreme Court intended to minimize the right of the insured to recover fully from the insurer of its choice.

Similarly, the cases upon which defendants rely determined allocation of liability among *insurers*. The courts did not find that the policyholder was required to seek only a prorated amount of coverage from each available insurer. See, *e.g.*, *Erie Ins. Group v. Nationwide Mut. Ins. Co.* (1989), 65 Ohio App.3d 741, 585 N.E.2d 464; *Turner Constr. Co. v. Commercial Union Ins. Co.* (1985), 24 Ohio App.3d 1, 24 OBR 22, 492 N.E.2d 836.

Because the Ohio cases which consider the effect of the "other insurance" provisions do not state the rights of recovery afforded the policyholder, this court finds the holding in *Keene* on this matter to be persuasive. This court will quote extensively the holding in *Keene*, 667 F.2d at 1050:

"Because each insurer is fully liable, and because [the insured] cannot collect more than it owes in damages, the issue of dividing insurance obligations arises. The only logical resolution of this issue is for [the insured] to be able to collect from any insurer whose coverage is triggered, the full amount of indemnity that it is due, subject only to the provisions in the policies that govern the allocation of liability when more than one policy covers an injury.

" * * *

"Our holding each insurer fully liable to [the insured] is also consistent with other courts' allocation of liability when more than one insurer covers an indivisible loss. [Citations omitted.]

"This does not mean that a single insurer will be saddled with full liability for any injury. When more than one policy applies to a loss, the 'other insurance' provisions of each policy provide a scheme by which the insurers' liability is to be apportioned.

" * * *

"These provisions of the policies must govern the allocation of liability *among the insurers* in any particular case of asbestos-related disease. However, *the primary duty of the insurers whose coverage is triggered by exposure or manifestation is to ensure that [the insured] is indemnified in full.*" (Emphasis added.)

*Keene* clearly states that although the "other insurance" clause governs the allocation of liability *among insurers,* the triggered insurers' primary duty is, nevertheless, to ensure that the insured is indemnified in full.

Defendants assert that there is some confusion on the part of OCF regarding the right to contribution and the effect of the "other insurance" clauses. This court does not identify any such mistake. The right to contribution is held by each cosurety that pays off an obligation to the benefit of the other cosureties. The "other insurance" clause when it is applied between competing excess insurers accomplishes the same effect. But, the effect of the "other insurance" clause should not be any different than the effect of insurers' right to contribution. To illustrate, in *Knutsen,* even though two insurers were equally liable on the same occurrence, through separate insurance agreements, and both were entitled to contribution in the end, the court nevertheless found that the insured did not have to get a percentage from each insurer. The insured was entitled to recover fully from either.[39]

This court finds that the "other insurance" clause serves only to ensure that all other available insurance will be depleted before an insurer becomes obligated; it does not affect the amount OCF can recover from any one insurer.[40] Therefore, so far as OCF's recovery is concerned, the policy does not provide for pro rata allocation of each defendant's obligation.[41]

---

**39.** The *Knutsen* court analyzed, under Ohio law, the relationship between two or more insurers obligated for the same liability, albeit by separate contracts. The insurer being pursued for indemnification by the Knutsen Company argued that it should only have to contribute a portion of the damages because there was other insurance available to the insured. The court held that when two insurers are liable for the same obligation, they are, as between themselves, cosureties. *Knutsen,* 36 Ohio App. at 245, 173 N.E. at 242. As such, unless otherwise provided for in the policies, each is equally obligated on an occurrence. The appellate court held that the insured was permitted to seek judgment against one or both of the insurers, although the insured could only recover fully once. Moreover, that court found that once the insured recovered fully from an insurer, there arose "a relation between the two cosureties, so that the one who paid could sue and recover contribution from his cosurety or cosureties, even if * * * the contract arose on separate obligations * * *." *Id.*

**40.** This ruling does not in any way limit the defendants' right to seek recovery, pursuant to the "other insurance" provisions, from other excess insurers in their same layer of coverage.

**41.** This court notes that the question of the proportion of coverage each insurer in a given layer of excess insurance is required to contribute is not before this court in the present action.

## G. *AMOUNT OF UNDERLYING INSURANCE WHICH MUST BE EXHAUSTED BEFORE ACIC'S AND PNIC'S LIABILITIES ATTACH*

This matter is before the court on OCF's, ACIC's and PNIC's motions regarding the amount of underlying insurance that must be exhausted before ACIC's and PNIC's liabilities attach. Upon consideration of the pleadings, memoranda of counsel, evidence, depositions and applicable law, the court grants OCF's motion and denies ACIC and PNIC's motion.

It is well settled in Ohio that "[a] court has an obligation to give plain language its ordinary meaning" in insurance contracts. *Miller v. Marrocco* (1986), 28 Ohio St.3d 438, 439, 28 OBR 489, 491, 504 N.E.2d 67, 69. Accordingly, when the policy language is clear and unambiguous, the court is not permitted to resort to construction to interpret the language. *Karabin v. State Auto. Mut. Ins. Co.* (1984), 10 Ohio St.3d 163, 166–167, 10 OBR 497, 499–500, 462 N.E.2d 403, 406–407.

OCF asserts in its motion for summary judgment that ACIC and PNIC are liable to provide coverage as soon as either the $35,000,000 underlying aggregate limit of the Aetna self-insurance policy or the $26,000,000 per occurrence total is exhausted.[42] Additionally, OCF argues that ACIC and PNIC do not follow form to the Northbrook and Transit policies with regard to the limits of liability. Therefore, ACIC and PNIC do not insure, as do Northbrook and Transit, for only those claims which exceed $1,000,000 for each occurrence.

ACIC and PNIC, on the other hand, argue that they do follow form to the Northbrook and Transit policies and, therefore, are liable only on asbestos claims which exceed $1,000,000 for each occurrence. Moreover, ACIC and PNIC claim that their liability does not attach until a total of $26,000,000 per occurrence has been exhausted.

Northbrook and Transit's coverage does not attach for asbestos-related injuries until an individual claim exceeds $1,000,000.[43] This per occurrence limit of

---

**42.** Northbrook and Transit provide coverage only for asbestos-related claims which exceed $1,000,000 for each occurrence, up to $25,000,000 total. See Endorsement No. 4 (Policy Binder, Exhibits B at 84, C at 175, D at 243, and E at 313). Additionally, OCF provides $1,000,000 of per occurrence coverage under its Aetna self-insurance policy, hence, providing a total of $26,000,000 per occurrence limit. Furthermore, all relevant provisions of the Northbrook and Transit policies, from September 1, 1979 to September 1, 1983, are substantially similar.

**43.** Endorsement No. 4 provides:

"With respect to claims arising out of asbestos products, the *limits of liability* hereunder shall apply excess of $1,000,000 including allocated expenses each and every occurrence." (Emphasis added.) (Policy Binder, Exhibit B at 84.)

liability is illustrated in the Subscription Policy under Items 2 and 3 of the Declarations Page. These items provide:

"Item 2. Underlying Excess Insurance (As respects claims arising out of Asbestos Products only, coverage is provided excess of $1,000,000 Each Occurrence.)

Northbrook Excess and Surplus Insurance Company $25,000,000 Excess of Primaries or Self–Insurance as shown in Policy No. 63–006–019.

Item 3. Underlying Excess Insurance Limits (As respects claims arising out of Asbestos Products only, coverage is provided excess of $1,000,000 Each Occurrence.)

$25,000,000

(Policy Binder, Exhibit B at 64.)

ACIC and PNIC do not follow form to the underlying umbrella policies of Northbrook and Transit with regard to the limits of liability. The Subscription Policy provides, in Condition No. 1, "Maintenance of Underlying Excess Insurance," the following:

"This Policy is subject to the same terms, definitions; exclusions and conditions (*except as regards* the premium, *the amount and limits of liability* and except as otherwise provided herein) as are contained in or as may be added to the Underlying Excess Insurance issued by Northbrook [or Transit] * * *." (Emphasis added.) (Policy Binder, Exhibit B at 65.)

Hence, because Endorsement No. 4 of the Northbrook and Transit policies clearly indicates that the $1,000,000 per occurrence requirement is a *limits of liability* provision, ACIC and PNIC do not follow form to that portion of Northbrook's and Transit's policies. Similarly, because Items 2 and 3 describe Northbrook's and Transit's limits of liability, these provisions do *not* establish ACIC's and PNIC's liabilities.

ACIC and PNIC have their own upper and lower limits of coverage which determine when their liability attaches. Insuring Agreement No. 2 of the Subscription Policy states:

"II. LIMIT OF LIABILITY—UNDERLYING LIMITS

"It is expressly agreed that liability shall attach to [ACIC and PNIC] only after the Underlying Excess Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability as follows:

| | |
|---|---|
| "$[$25,000,000 and $26,000,000] | ultimate net loss in respect of each occurrence, but |
| "$[$25,000,000 and $35,000,000 | in the aggregate for each annual period during the currency of this policy * * * " |

(Policy Binder, Exhibit B at 65.)

---

Giving plain meaning to the policy language, it is clear that OCF is insured under a two-track program of insurance. On the one hand, OCF has insurance for its "big ticket" claims, *i.e.*, those claims which exceed $1,000,000 per each occurrence. For these claims, OCF procured insurance through Northbrook and Transit, which agree to pay once an asbestos claim reaches $1,000,000, up to $25,000,000 total. On the other hand, OCF has insurance, or self-insurance, for all other claims. This other insurance covers asbestos claims which are under $1,000,000, up to an aggregate of $35,000,000. This two-track program is illustrated through the Insuring Agreement No. 2 of the Subscription Policy, which indicates that liability attaches when either the total per occurrence amount has been exhausted or when the aggregate for each annual period has been exhausted. Furthermore, Item 5 of the Declarations Page provides that "Underlying Primary and Excess Insurance" is "$26,000,000 Each Occurrence And $35,000,000 In The Aggregate Insured or Self–Insured." Clearly, Item 5 differentiates between a per-occurrence treatment and an aggregate treatment.

Whether ACIC's and PNIC's liabilities attach once the aggregate coverage, the per-occurrence coverage, or both are exhausted is determined by the Insuring Agreement. The agreement states that liability attaches only after the "Underlying Excess Insurers" have paid. ACIC and PNIC argue that this language indicates that Northbrook's and Transit's limits must, therefore, be exhausted before ACIC and PNIC are liable. Although this court acknowledges that the Northbrook and Transit policies are excess policies, they are only excess policies

for the larger claims in excess of $1,000,000.[44] Therefore, with regard to all claims under $1,000,000, Northbrook and Transit do not sit above the aggregate $35,000,000. Because ACIC and PNIC's liability is not limited to claims in excess of $1,000,000, it is not necessary for the Northbrook and Transit policies to be exhausted first. Rather, as the policy provides, liability attaches after exhaustion of either the $26,000,000 total for per-occurrence coverage or the $35,000,000 aggregate coverage.

Further support for this analysis is found in the "backup policies" issued by ACIC and PNIC themselves. For example, Paragraph No. 4 of ACIC's Insuring Agreement states that coverage is provided on a per-occurrence basis unless aggregate limits are specified.[45] In this instance, the "backup policies" provide for aggregate amounts. Therefore, as ACIC's policy indicates, coverage is provided upon exhaustion of aggregate limits when such are indicated, regardless of the existence of per-occurrence limits.[46]

A further indication that the Subscription Policy language entitles OCF to excess coverage, upon exhaustion of either the per-occurrence total or the aggregate, is found in a summation of OCF's insurance coverage. Immediately following each Subscription Policy in the Policy Binder is a document entitled "OWENS–CORNING FIBERGLAS CORPORATION CASUALTY EXCESS PROGRAM." This document states, in pertinent part:

"Northbrook Insurance Company

"Note: Solely As Respects Claims Arising Out Of Asbestos Products:

"(1) Northbrook's 1st Layer Umbrella Policy * * * provides coverage over $1,000,000 each occurrence.

---

44. The term "Underlying Excess Insurers" is standard policy language which indicates that, at different levels of excess coverage, there are numerous possible underlying excess insurers. The term is, therefore, not definitive of who the excess carriers are, how many there are, or whether they exist over all contingencies of coverage.

45. Paragraph No. 4 reads as follows:
 "Unless aggregate limits are specifically stated in items 3 and 4 of the Declarations, the coverage provided by this Policy applies only with respect to each accident or occurrence for limits in excess of the amount provided for same in the underlying insurance and does not apply over any reduced amount of underlying insurance in the event of the exhaustion of reduction of aggregate limits (if any) in the underlying insurance." (Policy Binder, Exhibit B at 145.)

46. Defendant's conflicting expert testimony regarding their interpretations of the policy provisions fails to refute the plain reading of the policy language and the overwhelming evidence to the contrary.

"(2) The participating carriers in the 2nd, 3rd, 4th and 5th Layers provide coverage over *$26,000,000 each occurrence/$35,000,000 aggregate.*"[47] (Emphasis added.)

In Webster's, a "diagonal" or "virgule" is defined as being used to separate "alternatives." Webster's Ninth New Collegiate Dictionary (1985) 1544. Therefore, although the summation is not a policy, the language is persuasive in showing that OCF understood from the onset that these excess carriers would provide coverage "over $26,000,000 each occurrence" *and/or* "$35,000,000 aggregate."

Finally, testimony of ACIC's expert John Kraeutler and Marsh & McLennan's John Anderson also support this finding. Kraeutler, who executed the Subscription Policy on behalf of ACIC, testified that "$35,000,000 in the aggregate insured or self-insured means that the excess policy * * * would be triggered or required to respond in excess of that number." Kraeutler Dep. 57. Anderson, as well, when asked how exhaustion of the separate underlying per occurrence and aggregate limits worked, testified that the excess carriers must provide coverage when "either one of those situations occur[s]." Anderson Dep. 67–68.

In conclusion, the court finds that, as a matter of law, ACIC and PNIC's liability attaches when either the underlying $35,000,000 aggregate limit or the underlying per occurrence limit has been exhausted. OCF's motion is, therefore, granted and ACIC and PNIC's motion is denied.

## H. *DEFENSE EXPENSES*

The issue of Associated's obligation to pay defense expenses in addition to policy limits is before the court on OCF's unopposed motion. Upon consideration of the pleadings, memorandum of counsel, evidence and applicable law, the court grants OCF's motion.

It is well settled in Ohio that "[a] court has an obligation to give plain language its ordinary meaning" in insurance contracts. *Miller, supra,* 28 Ohio St.3d at 439, 28 OBR at 490–491, 504 N.E.2d at 69. Based on an analysis of the language in Associated's policy, the court finds that the policy provides coverage, up to its policy limits, for settlements and judgments of third-party claims. Over and above its policy limits, Associated has a duty to pay defense expenses connected with those covered claims.

---

**47.** For each policy period, the language is identical, except for exchanging Northbrook for Transit when appropriate. These documents are located in the Policy Binder: Exhibit B at 67; Exhibit C at 158; Exhibit D at 226; Exhibit E at 297. Additionally, the court recognizes that ACIC's and PNIC's layers of coverage are within the 2nd and 5th layers of coverage.

According to Insuring Agreement No. 1 of the Declarations Page of the "Excess Umbrella Policy," Associated agrees

"to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability

"(a) imposed upon the Assured by law; or

"(b) assumed under contract or agreement by the Named Assured * * *

"for *damages*, direct or consequential *and expenses* * * *." (Emphasis added.) (Policy Binder, Exhibit A at 6.)

The word "damages" means amounts paid to satisfy settlements and judgments for "direct" or "consequential" damages, whereas the word "expenses" means expenses incurred in defending claims.

Support for this finding can be found in the testimony of Associated's E.L. Duncan and in the underlying Aetna umbrella policy, to which Associated follows form. Duncan conceded that "expenses," as used in this clause, means "in essence, legal expenses." Duncan Dep. 115. Additionally, the Aetna policy makes a distinction between damages and expenses for defense.

The Aetna umbrella policy, by analogy, sets forth Aetna's obligation to pay the "ultimate net loss" separately from its duty to pay defense expenses.[48] The Aetna policy defines "ultimate net loss" as "the sum actually paid or payable in cash in the settlement or satisfaction of any claim or suit for which the insured is liable either by *adjudication* or *settlement* * * *." (Emphasis added.) Definitions Section 5.13 (Policy Binder, Exhibit A at 16). Distinct from its obligation to pay damages or "ultimate net loss," Aetna undertakes to pay expenses in Section 2.3. There, Aetna agrees to "defend any suit seeking damages." Definitions Section 2.3 (Policy Binder, Exhibit A at 14). Aetna further agrees to pay "in addition to the amount of ultimate net loss payable: (1) all *expenses* incurred by [Aetna]" and "(3) reasonable *expenses* incurred by the insured at [Aetna's] request in assisting [Aetna] in the investigation or defense of any claim or event * * *." (Emphasis added.) Definitions Section 2.3(b). Clearly, the Aetna umbrella policy, like Associated's, obligates the insurer to pay for both "damages" or "ultimate net loss" and "expenses" for defense.

Based on a plain reading of the policy language, the amount which Associated is obligated to pay for defense expenses is in excess of its policy limits; therefore, Associated's payments for defense expenses will not deplete the amount of the policy limits. Insuring Agreement No. 2 of the Declarations Page of the "Excess Umbrella Policy" provides that Associated is liable to pay up to its limit of

---

48. The term "ultimate net loss" is equivalent to "damages" in Associated's policy.

liability for "*Ultimate Net Loss* in respect to each occurrence—subject to a limit of [$7,500,000] in the aggregate for each annual period * * *." (Emphasis added.) (Policy Binder, Exhibit A at 6.) According to this language, Associated's limit of liability is depleted only by payments for "Ultimate Net Loss," *i.e.*, "damages," and not for expenses. Hence, payment of "expenses"—which are not included in the meaning of "Ultimate Net Loss"—is in addition to limits. Further support for this analysis is found in the Aetna umbrella policy which provides that defense expenses are paid "in addition to the amount of ultimate net loss payable." Definitions Section 5.13 (Policy Binder, Exhibit A at 16).

This court, therefore, finds that Associated's policy obligates it to pay for defense "expenses." Furthermore, any payments made for defense "expenses" will not deplete the policy limits—which may only be depleted by payments for "damages." Accordingly, OCF's motion regarding Associated's obligation to pay defense expenses is found well taken.

### I. *TIME FRAME USED IN DETERMINING WHEN ASSOCIATED'S UNDERLYING LIMITS HAVE BEEN EXHAUSTED*

 Associated moves for summary judgment on the basis that the limits of the underlying umbrella coverage must be exhausted during Associated's policy period, March 9, 1979 through September 1, 1979, rather than during the entire year of the underlying insurance. Upon consideration of the pleadings, memoranda of counsel, evidence and applicable law, the court grants Associated's motion.

When language in an insurance contract is clear and unambiguous and has a plain and ordinary meaning, the court is not permitted to resort to construction to interpret the language. *Karabin, supra*, 10 Ohio St.3d at 166–167, 10 OBR at 499–500, 462 N.E.2d at 406–407.

 Associated relies on two provisions to resolve the question of when the underlying insurance must be exhausted. First, Associated relies on Insuring Agreement No. 3 of its excess liability policy, which provides, in part:

"The limits of the underlying insurance shall be maintained in full effect during the currency of this Policy except for reduction of such limits by exhaustion of aggregate limits (if any) contained therein solely by payment of claims resulting from accidents or *occurrences happening during the period thereof*." (Emphasis added.) (Policy Binder, Exhibit A at 3.)

Second, Associated refers to Insuring Agreement No. 5 in support of its contention. This provision states, in part:

"If aggregate limits are specifically stated in Item [*sic*] 3 and 4 of the Declarations, this Policy will apply in excess of reduced underlying insurance

provided such reduction in the underlying insurance *is solely the result of accidents or occurrences happening after the inception date of this Policy.*" (Emphasis added.) (Policy Binder, Exhibit A at 3.)

The court will consider each provision separately.

Associated points to *First State Underwriters v. Travelers Ins. Co.* (C.A.3, 1986), 803 F.2d 1308, in support of its argument. *First State* involved a provision similar to Insuring Agreement No. 3 of Associated's excess policy.[49] The court in *First State* found that this provision addressed the question of when the required losses must occur before the excess insured's liability began. The court held that, based on the policy language, exhaustion of the underlying insurance must be due to claims occurring during the policy period of the excess insurer and not during the policy period of the underlying insurer.

OCF distinguishes *First State* on the basis of the policy language at issue. This court agrees that the policy language analyzed in *First State* is distinguishable from Insuring Agreement No. 3. The policy language in *First State* did support that court's finding that exhaustion must be due to claims occurring during the policy period of the excess insurer, not the underlying insurer.[50] However, the policy language in Insuring Agreement No. 3 does not support a similar finding. The language does not indicate that Associated's policy period is controlling. Rather it states that, for purposes of maintaining the underlying insurance, the limits of the *underlying insurance* may be reduced only by "exhaustion of aggregate limits * * * *therein* solely by payment of claims resulting from accidents or occurrences happening during the period *thereof.*" (Emphasis added.) Hence, based on a plain reading of the policy language, the word "therein" refers to the aggregate limits of the underlying insurance, while the word "thereof" refers to the policy period of the underlying insurance. Therefore, for maintaining the underlying insurance limits, the limits may only be reduced by payments made during the policy period of the underlying insurance, not solely during Associated's policy period.

Based on this finding, it is not surprising that OCF also relies on Insuring Agreement No. 3 in support of its response. OCF argues that Associated's liability arises when the total amount of the underlying insurance, $100,000,000, has been exhausted, regardless of whether the exhaustion occurred during the

---

**49.** The provision in *First State* read as follows:

"* * * the underlying policy * * * shall be maintained in force during the currency of this policy, except for any reduction of the aggregate limit(s) contained therein solely by payment of claims in respect of occurrences happening during the policy period." *Id.*, 803 F.2d at 1313.

**50.** The court in *First State* found that the reference to "the policy period" referred to the excess carrier's policy period rather than the policy period of the underlying insurance.

shorter policy period of Associated's policy or during the entire year of the policy period belonging to the underlying insurance.

Unfortunately for OCF, this court does not find, as the court in *First State* found, that Insuring Agreement No. 3 addresses the issue of when the exhaustion of the underlying insurance must occur. Rather, Insuring Agreement No. 3 provides the manner in which the underlying insurance must be maintained. It does not define the period of time in which exhaustion of the underlying insurance must occur in order for the excess carriers to become liable. Instead, Insuring Agreement No. 5 specifically dictates the timeframe for exhaustion.[51]

Insuring Agreement No. 5 provides that Associated's policy "will apply in excess of reduced underlying insurance provided such reduction in the underlying insurance is solely the result of accidents or occurrences happening after the inception date of this Policy." (Policy Binder, Exhibit A at 3.) Throughout Associated's policy, the words "this Policy" consistently mean Associated's policy. Therefore, according to this provision, before Associated's liability can attach, the limits of the underlying insurance must be fully reduced during *Associated's policy period.*[52]

OCF's other arguments are similarly unpersuasive. For instance, OCF refers to Insuring Agreement No. 2, which provides:

"[L]iability shall attach to [Associated] only after the Underlying Umbrella Insurers have paid or have been held liable to pay the full amount of their respective Ultimate Net Loss Liability * * * [$100,000,000] in the aggregate for each annual period during the currency of this Policy * * *." (Policy Binder, Exhibit A at 6.)

OCF argues that the reference to "annual period" indicates that the exhaustion of the $100,000,000 may result from claims occurring anytime during the year-long period of the underlying insurers.

Insuring Agreement No. 2, however, specifically states that Associated's liability attaches only after the underlying insurers have paid or have been held liable to pay $100,000,000 during the currency of Associated's policy, *i.e.,* "this Policy." It is, perhaps, a poor use of the words "annual period" when referring to Associated's policy, because, in this instance, the policy is only six months in

---

51. This court does not find the situation in *First State* to be analogous because there is no indication by that court that the policy in question contained a provision similar to Associated's Insuring Agreement No. 5.

52. This court does not find Insuring Agreement Nos. 3 and 5 to be inconsistent or contradictory because they are dealing with two separate and distinct issues.

duration, rather than the normal year. This reference to "annual period," however, does not defeat the plain meaning of the provision.[53]

Insuring Agreement No. 2, therefore, does not provide that OCF may hold Associated liable once $100,000,000 has been exhausted, regardless of when the claims occurred during the period of the underlying insurance. Instead, this provision, along with Insuring Agreement No. 5, plainly indicates that Associated's liability attaches only after the underlying insurance has paid or been liable to pay $100,000,000 during Associated's policy period. In this instance, that period runs from March 9, 1979 through September 1, 1979.

OCF further alleges that its substantial compliance with this requirement entitles it to a declaration that no further payments from the underlying insurance are necessary to cause Associated's liability to attach. This court does not agree. The terms of the insurance agreement are clear and unambiguous; hence, "this court cannot in effect create a new contract by finding an intent not expressed by the clear language employed by the parties." *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 246, 7 O.O.3d 403, 406, 374 N.E.2d 146, 150. See, also, *E.S. Preston Assoc., Inc. v. Preston* (1986), 24 Ohio St.3d 7, 10, 24 OBR 5, 8–9, 492 N.E.2d 441, 445.

The policy provisions clearly indicate that Associated intended to be liable for coverage only after $100,000,000 of *underlying insurance* had been depleted during Associated's policy. Therefore, this court is unable to hold that only a partial compliance with the provisions of the contract is sufficient to attach Associated's liability. Therefore, the fact that $99,700,570 of underlying insurance was paid during Associated's policy period is insufficient to cause liability to attach. Similarly, even though over $40,000,000 in other excess coverage has been paid, this does not satisfy the terms of the policy either. In the absence of any law in support of its substantial compliance theory, OCF's argument must be rejected. Associated bargained for $100,000,000 of underlying insurance to be spent before its liability attached. It did not bargain for part of the $100,000,000 to be supplied by other excess carriers.

OCF will have to pay the additional $299,430 toward the underlying insurance before Associated's liability attaches. Associated's motion for partial summary judgment on the issue of exhaustion is, therefore, well taken.

---

**53.** If the provision was unclear and had merely stated, for example, "for each annual period during the currency of *the policy,*" the provision could possibly be construed as meaning the annual period of the underlying insurer. However, the provision clearly refers to the policy period of *Associated's policy.*

## J. EXPECTED OR INTENDED LOSSES

 Associated moves for summary judgment on the basis of its policy language that limits coverage to occurrences which are "neither expected nor intended." Aetna Umbrella Policy, Definitions Section 5.9 (Policy Binder, Exhibit A at 16). Upon consideration of the pleadings, memoranda of counsel, evidence and applicable law, the court finds that one or more genuine issues of material fact exist regarding whether, at the time it produced asbestos containing products, OCF knew of the potential health hazards related to asbestos. In addition, the court finds that Associated has failed to prove, as a matter of law, that OCF expected or intended the resulting asbestos-related injuries.

 As an initial matter, Associated bears the burden of proving that OCF expected or intended the asbestos-related injuries to occur. The Ohio Supreme Court recognizes the "expected or intended" language in the contract to be exclusionary language. *Physicians Ins. Co. v. Swanson* (1991), 58 Ohio St.3d 189, 569 N.E.2d 906. Therefore, Associated has the burden of showing that it is entitled to invoke the exclusion. *Continental Ins. Co. v. Louis Marx & Co.* (1980), 64 Ohio St.2d 399, 401, 18 O.O.3d 539, 540, 415 N.E.2d 315, 317; *Bonanza of Cleveland, Inc. v. Fairfax Underwriters* (1981), 5 Ohio App.3d 190, 5 OBR 423, 450 N.E.2d 689. To be awarded summary judgment on this issue, among other factors, Associated must establish that there is no genuine issue as to any material fact and that it is entitled to summary judgment as a matter of law. See *Harless, supra.* Associated cannot satisfy these elements.

In order for Associated "to avoid coverage on the basis of an exclusion for expected or intentional injuries, [it] must demonstrate that the injury itself was expected or intended." *Swanson, supra,* 58 Ohio St.3d at 193, 569 N.E.2d at 911. See, also, *Preferred Risk Ins. Co. v. Gill* (1987), 30 Ohio St.3d 108, 30 OBR 424, 507 N.E.2d 1118. The insurer must show that the injury was intentional; "[i]t is not sufficient to show merely that the *act* was intentional." (Emphasis added.) *Swanson, supra,* 58 Ohio St.3d at 193, 569 N.E.2d at 911.

 For bodily injury to be intentional in the context of a specific exclusion, the actor must desire "to cause the consequences of his act" or believe "that the consequences are substantially certain to result." *Nationwide Mut. Fire Ins. Co. v. Turner* (1986), 29 Ohio App.3d 73, 75, 29 OBR 83, 85, 503 N.E.2d 212, 215. Although not binding on this court, other jurisdictions have held that the "state of the insured's mind at the time of his act" is the point in time used to determine whether an occurrence was expected or intended. *Monsanto Co. v. Aetna Cas. & Sur. Co.* (Dec. 9, 1993), Del.Super., 1993 WL 563251 at *5. See, also, *Great Am. Ins. Co. v. Gaspard* (La.1992), 608 So.2d 981; *Allstate Ins. Co. v. Zuk* (1991), 78 N.Y.2d 41, 571 N.Y.S.2d 429, 574 N.E.2d 1035.

This court will also consider the perspective of the insured at the time of its action. OCF initiated the possibility of injury when it manufactured the asbestos-containing products, not when it purchased insurance. Hence, the manufacturing process is the definitive action. To determine whether OCF "expected or intended" the occurrence, therefore, this court will consider OCF"s intent at the time it manufactured asbestos-containing products.

The issue to be decided is whether OCF intended, at the time it manufactured its products, the injuries which resulted from exposure to the asbestos-containing products. See *Swanson, supra.* In attempting to establish that OCF "expected" and "intended" the injuries, Associated asserts that because OCF knew of the dangers of asbestos in the 1940s, it intended that people would be harmed when it continued to manufacture the products.[54] Associated refers to a purported OCF memorandum, written in the 1940s by Edward Ames and directed to O.E. Gregory, which recognizes some of the known dangers linked with asbestos materials.

Even if knowledge of the dangers of asbestos was sufficient to prove intent, which it is not, the issue would nevertheless be a question of fact, since it is unclear whether OCF knew exposure to asbestos particles caused by its product was dangerous. Although OCF concedes that it knew of the dangers of exposure to asbestos at high levels of particles per cubic foot ("PPCF"), OCF cites numerous studies that establish that, until at least 1964, the scientific community considered low-level exposure to asbestos to be safe.[55] Until OCF received

---

54. In support of this proposition, Associated cites *Owens–Illinois, Inc. v. United Ins. Co.* (1993), 264 N.J.Super. 460, 625 A.2d 1. That court found that coverage of injuries should be denied as an expected or intended event when the insurer has demonstrated that a manufacturer marketed an asbestos-containing product long after it had learned of the product's propensity to cause injury. *Id.* By analogy, however, that court determined that summary judgment could not be granted as a question of fact existed which should be tried by the factfinder.

55. In 1938, a study conducted by the National Institutes of Health at the direction of the United States Surgeon General concluded that "if asbestos dust concentrations in the air breathed are kept below [five million PPCF] new cases of asbestosis would not appear." W. Dreessen, J.M. Dallavalle, T. Edwards, U.W. Miller, R.R. Sayers, U.S. Treasury Dept., Public Health Bulletin 241 (Aug. 1938), "A Study of Asbestosis in the Asbestos Textile Industry," Abstract.

In 1946, a study of the asbestos pipe covering of naval vessels concluded that "[i]n general we feel that dust counts below 5 million [PPCF] by Konimeter indicate good dust control." W. Fleischer, Viles, R.L. Gade, P. Drinker, A Health Survey of Pipe Covering Operations in Constructing Naval Vessels, 28:1 J.Indust.Hygiene & Toxicology 9, 13.

Subsequently, in 1946, the American Conference of Governmental Industrial Hygienists promulgated an industry standard for safe asbestos exposure in the workplace of five million PPCF. 1946 Report of the subcommittee on threshold limits, reprinted in 9 Ann.Am.Conf.Indus.Hygienists (1984), 343, at 344. This safety standard was relied on as late as 1972 by the Occupational Safety and Health Administration. See Division of Indus. Hygiene, Ohio Dept.

medical evidence to the contrary, or until it had asbestos-related claims filed against it, OCF had no reason to know that the levels of asbestos it was working with was harmful.

OCF's experts testified that the health risks of low-level exposure to asbestos were not recognized by the scientific or medical community before the mid–1960s. See Hughson Dep. 105–106, 117, 125. See, also, Howard Dep. 18. Not until 1964 and the study by Dr. Selikoff does OCF allege it knew of the potential hazards of asbestos.[56] Moreover, prior to October 1966, OCF states that neither it, nor its predecessor, Owens–Illinois, received any report of asbestos-related health problems from locations where Kaylo[57] was produced.[58] Finally, according to OCF, Kaylo became asbestos-free in 1972, the same year OSHA first adopted an asbestos-exposure safety standard.

OCF has sufficiently established a material question of fact regarding whether it knew, while it was producing the asbestos-containing products, of the potential hazards of the low levels of asbestos. Therefore, even if Associated could prove intent by showing that OCF knew of the dangers of asbestos, the issue is inappropriate for summary judgment, as there exists a genuine issue of material fact as to OCF's knowledge.

Furthermore, Associated has failed to establish, as a matter of law, that it is entitled to summary judgment on this issue. Beyond its argument that OCF intended the injuries because it knew of the dangers, Associated offers no evidence to establish that OCF, at the time it manufactured the products, expected or intended the resulting injuries. See *Swanson, supra.* Absent a showing of its entitlement to judgment, Associated's motion for partial summary judgment must be denied.

## K. *INSURABILITY OF PUNITIVE DAMAGES AWARDS*

██ This matter is before the court on ACIC and PNIC's motion seeking a declaration that coverage of punitive damages under their policies is contrary to

---

of Health (1946), Legal Requirements For the Prevention and Control of Industrial Public Health Hazards, 16; Occupational Health & Safety Standards, Standard for Exposure to Asbestos Dust (1972), 37 Fed.Reg. 11,318, 11,320.

**56.** Dr. Selikoff did a study on the occurrence of asbestosis among insulation workers. It was at that point, OCF asserts, that the scientific and medical communities first recognized the potential risk of low-level exposure to asbestos. See I.J. Selikoff, M.D., J. Churg, M.D., and E.C. Hammond, D.S.C., Asbestos Exposure and Neoplasia (Apr. 6, 1994), 188 JAMA 22.

**57.** Kaylo is the product name for OCF's asbestos-containing insulation material.

**58.** See Memorandum from W.C. Taylor to H.J. Welter, dated June 30, 1964. See, also, Memorandum from Wayne Johnson to J.M. Briley, dated October 5, 1966.

public policy and prohibited as a matter of law. Upon consideration of the pleadings, memoranda of counsel, evidence and applicable law, the court grants ACIC and PNIC's motion.

Ohio law prohibits indemnification from an insurer for awards of punitive damages resulting from the insured's own conduct. *Lumbermens Mut. Cas. Co. v. S–W Indus.* (C.A.6, 1994), 23 F.3d 970. See, also, *State Farm Mut. Ins. Co. v. Blevins* (1990), 49 Ohio St.3d 165, 551 N.E.2d 955. Because the purpose of punitive damages is "to punish and deter the tortfeasor rather than to compensate the victim, there is a * * * public policy interest against insurance coverage which would indemnify the tortfeasor against punitive damages." *Harasyn v. Normandy Metals, Inc.* (1990), 49 Ohio St.3d 173, 176, 551 N.E.2d 962, 965. See, also, *Casey v. Calhoun* (1987), 40 Ohio App.3d 83, 86, 531 N.E.2d 1348, 1351 ("Both the legislature and judiciary have determined that insuring against punitives is detrimental to the welfare and morals of the public." Citations omitted.).

ACIC and PNIC assert that, because the parties have agreed that Ohio law is controlling in the present action, OCF should not be entitled to indemnification under the policy for awards of punitive damages. To the contrary, OCF argues that, although Ohio law prohibits coverage for punitive damages, it should, nevertheless, be indemnified for punitive damages which were awarded in other jurisdictions where punitive damages are allowed for less culpable conduct and where there are less potent public policy interests at stake.[59] In support, OCF refers this court to a California case which addressed this issue. That court found that, although indemnification for punitive damages was prohibited in California, coverage for punitive damages is permitted "in those states * * * where punitive damages are allowed for less culpable conduct." *Flintkote Co. v. Am. Mut. Liab. Ins. Co.* (Aug. 17, 1993), Cal.Super. No. 808–594, unreported, at 178.

As there is no Ohio law which supports *Flintkote*'s proposition, this court declines to adopt that court's holding. OCF filed its action in Ohio and has agreed to abide by Ohio law—which prohibits indemnification for punitive damages. See *Lumbermens, supra.* Therefore, this court finds that OCF is not

---

59. Although OCF urges this court to allow coverage for punitive damages awarded in other states, OCF has not provided this court with any information regarding those jurisdictions which awarded punitive damages against OCF. It did not indicate where punitive damages were awarded, nor for what reasons they are awarded in those jurisdictions. Nor has OCF offered any law regarding whether those jurisdictions allow indemnification for punitive damages.

entitled to indemnification for any awards of punitive damages which would otherwise be covered by ACIC's and PNIC's policies. Based on the foregoing, the court finds ACIC and PNIC's motion well taken.

## JUDGMENT ENTRY

It is hereby ORDERED, ADJUDGED and DECREED that American Centennial Insurance Company and Protective National Insurance Company's brief on trigger of coverage will be treated only as response, and not as a motion.

It is further ORDERED that Owens–Corning Fiberglas Corporation's motion for partial summary judgment regarding the admittance of the policy binder is GRANTED in part and DENIED in part. The policy binder will be admitted into evidence, with the exception that pages 499, 501, 502, and 503 be stricken from the court's consideration.

It is further ORDERED that Owens–Corning Fiberglas Corporation's motion for partial summary judgment regarding the defendants' assertion of the defense of the "known loss doctrine" is GRANTED. It is also ORDERED that Associated International Insurance Company's motion on the "known loss doctrine" is DENIED.

It is further ORDERED that Owens–Corning Fiberglas Corporation's motion for partial summary judgment regarding the defendants' counterclaims and affirmative defenses of fraud or misrepresentation is DENIED in part and GRANTED in part. Owens–Corning Fiberglas Corporation's motion as to American Centennial Insurance Company and Protective National Insurance Company is DENIED. Owens–Corning Fiberglas Corporation's motion as to Associated International Insurance Company is GRANTED.

It is further ORDERED that Owens–Corning Fiberglas Corporation's motion for partial summary judgment regarding timeliness of notice to the defendants is GRANTED.

It is further ORDERED that Owens–Corning Fiberglas Corporation's motion for partial summary judgment regarding trigger of coverage is GRANTED. It is also ORDERED that Associated International Insurance Company's motion on trigger of coverage is DENIED.

It is further ORDERED that Owens–Corning Fiberglas Corporation's motion for partial summary judgment regarding percentage of coverage to be allocated to each insurer is GRANTED. It is also ORDERED that Associated International Insurance Company's motion on the percentage of coverage issue is

DENIED. American Centennial Insurance Company and Protective National Insurance Company's combined motion on the percentage of coverage issue is DENIED.

It is further ORDERED that Owens–Corning Fiberglas Corporation's motion for partial summary judgment regarding the amount of underlying insurance which must be exhausted before American Centennial Insurance Company's and Protective National Insurance Company's liabilities attach is GRANTED. It is also ORDERED that American Centennial Insurance Company and Protective National Insurance Company's combined motion on this exhaustion issue is DENIED.

It is further ORDERED that Owens–Corning Fiberglas Corporation's motion for partial summary judgment regarding Associated's obligation to pay defense expenses in addition to policy limits is GRANTED.

It is further ORDERED that Associated International Insurance Company's motion for partial summary judgment regarding the time frame used in determining when Associated's underlying limits have been exhausted is GRANTED.

It is further ORDERED that Associated International Insurance Company's motion for partial summary judgment regarding losses which are either expected or intended is DENIED.

It is further ORDERED that American Centennial Insurance Company and Protective National Insurance Company's combined motion regarding coverage of punitive damages is GRANTED.

*Judgment accordingly.*